In the Matter of Fritz DESIR,
Petitioner–Appellant,

v.

David N. ILCHERT, District Director,
Immigration & Naturalization
Service, Respondent–Appellee.

No. 86–2064.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1987.

Decided March 7, 1988.

As Amended on Denial of Rehearing
May 26, 1988.

Robert D. Baizer, Yonemura & Yasaki, Oakland, Cal., for petitioner-appellant.

Susan L. Kamlet and Larry J. Gallagher, Asst. U.S. Attys., San Francisco, Cal., for respondent-appellee.

Before CHOY, TANG and NELSON, Circuit Judges.

TANG, Circuit Judge:

We examine whether beatings, imprisonment, and assaults by government security forces for the purpose of extortion may constitute persecution on account of political opinion within the meaning of sections 101(a)(42)(A) and 243(h)(1) of the Immigration and Nationality Act (the Act). Because we answer in the affirmative, we reverse the district court's denial of an alien's petition for a writ of habeas corpus.

I

Fritz Desir, a citizen and native of Haiti, was detained in Miami on September 11, 1981 and placed in exclusion proceedings under section 212(a)(20) of the Act, 8 U.S.C. § 1182(a)(20) (1982). Desir had fled Haiti aboard a boat which was towed into Miami by the United States Coast Guard. Desir had supported himself in Haiti by fishing and by selling curios to tourists in Port-au-Prince. In exchange for the right to fish in certain waters, Desir was expected to pay bribes to the Haitian security forces known as the Ton Ton Macoutes. Desir introduced expert testimony and documentary evidence to the effect that the Haitian government operated as a "kleptocracy," or government by thievery, enforced by the Ton Ton Macoutes' terrorizing and extortion of powerless citizens. Persons who resisted the extortion were marked as political subversives and subjected to official repression.

Desir was arrested, assaulted, and threatened by the Macoutes on several occasions from 1979 to 1981 as a result of his failure to pay bribes and his competition with Macoutes-approved merchants and fishermen. The first such incident occurred in June 1979. Captain Monday, an official associated with the Macoutes, was sailing by in a small boat when he saw Desir and his partner in their fishing boat and stopped them. Captain Monday boarded their boat, told the men that they were not to be fishing in that area and then

struck Desir some fifty times with a wooden stick.

In 1980, Desir testified he was arrested "for speaking out." The petitioner stated he had been a member of a small organization, the *Sans Manman*, meaning "without mother."[1] The immigration judge found the organization appeared to consist of a group of three young men, who spoke out against the Government, though only privately.

Two later incidents in 1981 involved encounters with another official, Captain Sauval, also of the Ton Ton Macoutes. In the first instance, Desir and his partner were asleep in their fishing boat when they were awakened at gunpoint by Captain Sauval. Sauval bound the men and took them to jail. Desir testified that during the time of his arrest, a period of some two to three weeks, he was beaten with a wooden stick and warned that he would be shot if "caught" again. Desir stated the Ton Ton Macoutes beat him because he did not pay money to them.

Later that same year, Captain Sauval again threatened and assaulted Desir. Desir was near the waterfront dock in Port-au-Prince attempting to sell to tourists small wooden tables he had made. When Captain Sauval recognized Desir, he threatened him with a gun, demanded a "contribution" and fired upon him when refused. Desir testified that Captain Sauval again took him into custody and threatened to shoot him if he was ever seen again on the beach front.

After the incidents involving Captain Sauval, Desir moved to another county where he believed that the security forces would not harass him. He lived in that area for three months without incident, although there also, he stated "you had to be associated with [the] police, the Ton Ton Makute (sic), to make a living." Thereafter, he fled on the first available boat for the United States. Desir fears that his return to Haiti would lead to a recurrence of the earlier abuses against him by the Ton Ton Macoutes, and he has submitted documentary evidence to the effect that Haitians who are deported to Haiti often face death, imprisonment and torture.

The INS placed Desir in exclusion proceedings pursuant to section 236 of the Act, 8 U.S.C. § 1226 (1982), and charged him as being excludable under section 212(a)(20) of the Act, 8 U.S.C. § 1182(a)(20) (1982) (immigrant not in possession of valid entry document). Desir sought asylum under sections 208 and 101(a)(42)(A) (1982) of the Act, 8 U.S.C. §§ 1158, 1101(a)(42)(A) and prohibition against deportation[2] under section 243(h)(1) of the Act, 8 U.S.C. § 1253(h) (1982). The Immigration Judge (IJ) found Desir's testimony "creditable," although noting some inconsistency, and accepted all of his statements as true. Nevertheless, the Immigration Judge found that Desir had failed to carry his burden of proof to establish entitlement to asylum or prohibition of deportation. Thus, the IJ found Desir excludable as charged and ordered him deported.

The Board of Immigration Appeals (BIA) affirmed the decision of the Immigration Judge on the basis that the Ton Ton Macoutes harassed Desir not because of his race, religion, nationality, membership in a particular social group, or political opinion, but instead, because they wished to extort money from him for personal reasons. The BIA reasoned that Desir had not shown that his refusal to pay the bribes was an expression of political opinion rather than the product of other motivations such as inability to pay. The BIA further noted that Desir had failed to show that the Macoutes interpreted his failure to pay bribes as politically motivated, or that he was a member of a particular social group composed of persons who refused to pay bribes to the Macoutes.

---

**1.** Desir was orphaned as a child. He had other siblings. He testified that his sister was beaten to death while trying to escape from Haiti in 1981. He also has two brothers, one in Haiti, one in the United States; he has no contact with either of them.

**2.** We employ this term instead of the statutory term, "withholding of deportation," for reasons explained in *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1282 (9th Cir.1984).

On April 18, 1986, Desir filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of California.[3] The district court found substantial evidence in support of the BIA affirmance of the denial of Desir's application and denied the petition on June 2, 1986. The district court and the BIA both took judicial notice of the fact that the regime headed by President Jean–Claude ("Baby Doc") Duvalier ended on February 6, 1986, and that the new government had ordered the Ton Ton Macoutes disbanded. Desir timely appealed. We have jurisdiction under 28 U.S.C. § 2253.

## II

The decision whether to grant or deny a petition for habeas corpus is reviewed de novo. *Grooms v. Keeney*, 826 F.2d 883, 885 (9th Cir.1987); *Chatman v. Marquez*, 754 F.2d 1531, 1533–34 (9th Cir.), *cert. denied*, 474 U.S. 841, 106 S.Ct. 124, 88 L.Ed.2d 101 (1985). The factual findings underlying the BIA's denial of the applications for asylum and prohibition of deportation are reviewed under the substantial evidence standard. *Turcios v. INS*, 821 F.2d 1396, 1398 (9th Cir.1987); *McMullen v. INS*, 658 F.2d 1312, 1316 (9th Cir.1981). Where, however, the agency determinations turn on purely legal questions concerning the requirements of the applicable statutes, "[t]he questions before us are questions of law, which we review *de novo.*" *Lazo–Majano v. INS*, 813 F.2d 1432, 1434 (9th Cir.1987). *See also, Florez–De Solis v. INS*, 796 F.2d 330, 333 (9th Cir.1986).

## III

Desir contends that the evidence amply demonstrated past persecution on account of political opinion within the meaning of the Act.[4] We agree.

### A.

To establish eligibility for asylum under section 208, an alien must demonstrate that he or she has been persecuted or has a "well-founded fear of persecution" on account of one of the enumerated factors. *See* 8 U.S.C. §§ 1101(a)(42)(A), 1158(a). As we have indicated, the test for refugee status includes both a subjective and objective component. *Bolanos–Hernandez v. INS*, 767 F.2d 1277, 1283 & n. 11 (9th Cir.1984). The subjective component is satisfied if the fear is "genuine." *Hernandez–Ortiz v. INS*, 777 F.2d 509, 513 (9th Cir.1985). The objective component requires a showing, "by credible, direct, and specific evidence in the record," *Diaz-Escobar v. INS*, 782 F.2d 1488, 1492 (9th Cir.1986), that persecution is a "reasonable possibility," *INS v. Cardoza–Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1217–18, 94 L.Ed. 2d 434 (1987). The evidentiary facts necessary to support a finding of persecution on one of the statutory grounds may be established by the production of specific documentary evidence or by the credible and persuasive testimony of the applicant. *Cardoza–Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir.1985), *aff'd*, —— U.S. ——, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Blanco-Comarribas v. INS*, 830 F.2d 1039, 1042–43 (9th Cir.1987).

The statutory term "persecution" or "well founded fear of persecution" has been defined in this Circuit as encompassing more than just restrictions or threats to life and liberty. *Cordoza–Fonseca*, 767 F.2d at 1452. Most simply, we have stated

---

**3.** 8 U.S.C. § 1105a(b) (1982) provides that the alien's sole means for obtaining review of an order of exclusion is a petition for a writ of habeas corpus. *See, e.g., Castillo–Magallon v. INS*, 729 F.2d 1227 (9th Cir.1984).

**4.** Section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1982) provides in pertinent part:

> The term "refugee" means ... any person who is outside any country of such person's nationality ... and who is unable or unwill-

ing to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion

. . . . .

8 U.S.C. § 1158(a) grants the Attorney General discretion to award asylum once the alien has established that he or she is a refugee as defined in section 1101(a)(42)(A).

that persecution involves "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir.1969). Persecution is found "only when there is a difference between the persecutor's views or status and that of the victim; it is oppression which is inflicted on groups or individuals because of a difference that the persecutor will not tolerate." *Hernandez-Ortiz*, 777 F.2d at 516. Thus, in determining whether the threats and violence of the Ton Ton Macoutes constituted political persecution we may examine the motives and perspective of both the victim and persecutor, for at issue is "the relationship between the two." *Id.*

### B.

We first consider the objective facts advanced by the petitioner. *Cardoza-Fonseca*, 767 F.2d at 1453 (alien's subjective fear relevant only after introduction of objective evidence sufficient to suggest risk of persecution). Desir credibly testified at his exclusion hearing that he had been arrested three times, severely beaten on several occasions, and directly fired upon by an officer associated with the Ton Ton Macoutes who "recognized" him. These abuses resulted because of Desir's failure to make "contributions" to the Macoutes upon demand. In addition to this physical abuse, Desir's ability to earn a livelihood was also severely impaired by his refusal to give money to the Macoutes because the threats on his life precluded both fishing and the selling of curios. As a direct consequence of the threats and violence perpetrated by the Macoutes, the petitioner testified that he was required to move to a different county. This personal account points to sufficient specific and objective facts to suggest that Desir's fear has some basis "in the reality of the circumstances," *Blanco-Comarribas*, 830 F.2d at 1042, insofar as he was tangibly harmed, both physically and in his ability to earn a livelihood. *See Kovac*, 407 F.2d at 107 (imposition of substantial economic disadvantage upon an alien for reasons of race, religion or political opinion may support application for

withholding of deportation). On the subjective side, Desir also testified that he personally feared to return to Haiti because of his "previous problems" with the Macoutes.

The record also contains substantial evidence that the Haitian government under Duvalier operated as a "kleptocracy," or government by thievery, from the highest to the lowest level. The Ton Ton Macoutes, an elaborate network of official and semi-official security forces, factions of which were fiercely loyal to the Duvalier family, formed the heart of the system. Because the Macoutes often went unpaid except for a few of their highest ranking officers, they depended on their fellow Haitians for their livelihood, a circumstance encouraging wide-scale corruption, extortion and violence. Refusal to comply with extortionate demands resulted in the attribution of anti-government sympathies and also in swift reprisals, including beatings, imprisonment and death. At least one district court recognized this reality:

> Because the Macoutes are an organization created for political purposes, they bring politics to the villages of Haiti. To challenge the extortion by which the Macoutes exist is to challenge the underpinnings of the political system. Accordingly, to resist extortion is to become an enemy of the government. Moreover, it is not unreasonable to assume that when a single individual has the unfettered power to determine who is an enemy of the government, the individual's enemies are soon classified as the government's enemies..... [V]irtually any encounter with a member of the security forces is a political encounter.

*Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 498–500 (S.D.Fla.1980), *aff'd as modified sub nom. Haitian Refugee Center v. Smith*, 676 F.2d 1023 (5th Cir. Unit B 1982).

Desir's refusal to accede to extortion in a political system founded on extortion resulted in his classification and treatment as a subversive. The extortion and other lawlessness inflicted by the Ton Ton Mac-

outes[5] on Desir thus amounted to more than arbitrary, personal actions undertaken independent of the Duvalier regime. Instead, such actions were tactics whereby the Duvalier regime systematically exercised its authority by way of terror and intimidation. Although the results of extortion may have directly benefited the Macoutes as individuals, the intimidation and fear thereby engendered accrued to the benefit of the Duvalier regime.

Thus, the treatment endured by Desir is more properly understood as motivated by "political" rather than "personal" interests. In *Lazo–Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987), this court considered the asylum and prohibition of deportation claim of an alien who had been brutalized, beaten, and raped by a member of the Salvadoran Armed Forces. In that case as in this, the essentially political nature of the alien's predicament is apparent given the superior status and political power of the government security forces, enforced through threats and actual violence, coupled with the reasonable belief that denunciations by such officers will carry considerable weight. In *Zayas–Marini v. INS,* 785 F.2d 801 (9th Cir.1986) by contrast, we denied a Paraguayan alien's petition for review of a denial of section 208 and 243(h) relief where the alien's differences with two officials, which in one instance arose from the refusal to participate in a smuggling scheme, stemmed from "personal hostility" between what were essentially social and political equals. As stated in *Lazo–Majano,* 813 F.2d at 1436, the *Zayas–Marini* case essentially involved "a

falling out within the Paraguayan elite." The relationship of Desir to Captain Sauval of the Ton Ton Macoutes, like that of Olimpia Lazo–Majano to Sergeant Zuniga of the Salvadoran Armed Forces, is a rather different matter: it is a relationship of the weak to the powerful, which in particular instances, defined by the Act and the decisional law of this Circuit, can result in persecution on account of political opinion or imputed political opinion.[6]

The relationship between victim and persecutor is especially significant in situations where the petitioner may not have overtly given any expression to his opinions, but because of particular acts or circumstances, certain opinions are attributed to him. In several cases we have recognized that such decisions or acts, when sufficiently conscious and deliberate on the part of the petitioner, may support a claim of well-founded fear on account of political opinion. *See, e.g., Bolanos–Hernandez,* 767 F.2d 1277 (refusal of former member of right-wing party and military groups to join guerrillas in El Salvador was conscious choice to remain politically neutral and constituted political opinion); *Argueta v. INS,* 759 F.2d 1395 (9th Cir.1985) (death threat based on persecutors' erroneous belief that alien was member of guerrilla organization coupled with affirmative choice to remain politically neutral sufficient to establish clear probability of persecution based on political opinion); *Del Valle v. INS,* 776 F.2d 1407 (9th Cir.1985) (refusal to join "death squad" and pursuit of studies and other community activities constituted choice to remain neutral and expression of

---

**5.** The Act encompasses acts of persecution "by the government or by a group which the government is unable to control." *McMullen v. INS,* 658 F.2d 1312, 1315 & n. 2 (9th Cir.1981); *accord, Bolanos–Hernandez,* 767 F.2d at 1284; *Zepeda–Melendez v. INS,* 741 F.2d 285, 289 (9th Cir.1984).

**6.** Other distinctions between the *Zayas–Marini* fact pattern and those of the instant case are also apparent. Apart from his problems with the two named officers, Zayas–Marini remained on excellent terms with the Paraguayan government following his departure from the country, so much so that he was offered the New York consulate's position. *See Zayas–Marini,* 785 F.2d at 806. Since arriving in the United States,

Desir, by contrast, has maintained close ties to Haitian groups opposed to the Duvalier government; his roommate at the time of the exclusion hearing in 1985 was a prominent opposition figure active in the Haitian refugee community. A significant source of Desir's fear of deportation to Haiti stems from his opposition activities in the United States and his belief that he will be further punished for his associations. We do not address this claim.

Also, though not dispositive of a claim to refugee status, Zayas–Marini in no way suffered the repeated physical assaults and harm inflicted upon Desir. *See Zayas–Marini,* 785 F.2d at 806.

political opinion under the Act); *Hernandez–Ortiz,* 777 F.2d 517 (alien's actual political view, whether neutral or partisan, irrelevant; where government attributed certain political opinions to him this constituted persecution on account of political opinion); *Lazo–Majano,* 813 F.2d 1435 (alien persecuted because of political opinion imputed by persecutor).

Under this line of cases, the harm suffered by Fritz Desir constituted persecution on account of political opinion. Like the petitioners in *Bolanos–Hernandez* and *Del Valle,* Desir expressly refused to affiliate himself with a particular faction by declining to accede to the Macoutes extortionate demands. By this act, Desir was perceived as disloyal and subversive and the machinery of the state, enforced by the Macoutes, was violently engaged against him. Desir's actual political view at the time, whether neutral or partisan, or his inability to pay, is not relevant to our assessment of his refugee status. *See Hernandez–Ortiz,* 777 F.2d at 517. We must view Desir as possessing a political opinion because his persecutors, the Ton Ton Macoutes, both attributed subversive views to Desir and treated him as a subversive. As we have noted elsewhere, whether the political opinion is actually held or implied makes little difference where the alien's life is equally at risk. *See Lazo–Majano,* 813 F.2d at 1435 ("[i]f the persecutor thinks the person guilty of a political opinion, then the person is at risk.") In the context of Duvalier's Haiti, the refusal to submit to the extortionate demands of the Macoutes could, and in Desir's case did, constitute a political choice.

■ Where evidence of a specific threat on an alien's life is presented in conjunction with general corroboration which describes political and social turmoil, the alien has succeeded in establishing prima facie eligibility for asylum. *Bolanos–Hernandez,* 767 F.2d at 1284, 1288. Because Desir has presented evidence of (1) successive and specific threats on his life; (2) on the basis of imputed political opinion; (3) in the context of systemic human rights abuses linked to extortion by the Ton Ton Macoutes under Duvalier, he has established his eligibility for asylum.

■ Further, past persecution, without more, satisfies the requirement of § 101(a)(42)(A), even independent of establishing a well-founded fear of future persecution. If an alien establishes eligibility for relief under section 208(a), "[n]o further showing that he or she 'would be' persecuted is required." *See Cardoza–Fonseca,* 107 S.Ct. at 1218; *see also,* 767 F.2d at 1453 (citing *Carvajal–Munoz v. INS,* 743 F.2d 562, 574 (7th Cir.1984)); *Blanco–Comarribas,* 830 F.2d at 1043; INS Operations Instruction § 208.4, reprinted in 4 Gordon & Rosenfield, Immigration Law and Procedure at 23–156.14(1) (Bender 1987). Accordingly, we find, based on the record in this case, that Desir has established his eligibility for a grant of asylum. The Board of Immigration Appeals erred when it concluded that the beatings, arrests and assaults for purposes of extortion presented in this case did not constitute persecution on the basis of political opinion within the meaning of the Act.[7]

## IV

We now turn to the question of whether substantial evidence supported the BIA determination that Desir failed to demonstrate a clear probability of persecution as required by section 243(h)(1) of the Act, 8 U.S.C. § 1253(h)(1).[8]

Resolution of this issue requires that we determine whether past persecution of Desir by agents of the Duvalier regime indi-

---

**7.** Because we conclude Desir has established his eligibility for asylum on the basis of the political opinion factor of the refugee definition, 8 U.S.C. § 1101(a)(42)(A), we do not reach his contention that eligibility was also established because of his membership in a "particular social group" of small merchants and fishermen who refused to pay bribes.

**8.** Section 1253(h)(1) provides in pertinent part: The Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion.

cates a clear probability that he "would be" persecuted upon his return to post-Duvalier Haiti.[9] Desir has referred to, but did not submit to the BIA nor to this court, materials indicating that repression continues in Haiti despite the exit of the Duvalier regime and the order that the Macoutes be disbanded. We do not doubt that this failure was due to the fact that, when Desir presented his evidence to the IJ, the events of which we now take judicial notice had not yet occurred. Given our holding that resistance to official government extortion may constitute expression of a political opinion for the purpose of section 101(a)(42), it follows that facts which Desir has not yet had an opportunity to develop may form the basis for a valid claim under section 243(h)(1). Accordingly, we vacate the determination of the district court as to this claim, and remand for a determination of whether Desir now faces a clear probability of persecution should he be returned to Haiti.[10] *See, e.g., Del Valle,* 776 F.2d at 1414. Upon remand, Desir will have the opportunity to demonstrate facts regarding the treatment of persons like himself in post-Duvalier Haiti.

### V

We reverse the district court's denial of Desir's habeas petition. The case is remanded to the district court, with instructions to remand to the Attorney General for the exercise of his discretion under section 208(a) of the Act and for further proceedings on the prohibition of deportation claim under section 243(h) of the Act, not inconsistent with this opinion.

REVERSED and REMANDED.

9. As did the district court, we take judicial notice of the fact that President Duvalier fled Haiti on February 6, 1986, and that the successor government ordered that the Macoutes be disbanded.

10. Nor is this question foreclosed by our holding that Desir established prima facie eligibility for a grant of asylum. Despite prima facie

eligibility, the Attorney General still has discretion to refuse a grant of asylum. 8 U.S.C. § 1158(a). Prohibition against deportation under section 243(h)(1), however, is mandatory; once the alien has established eligibility therefore, the Attorney General has no discretion to deport the alien. *See Bolanos–Hernandez,* 767 F.2d 1277.