# In re T-M-B-, Respondent

*Decided February 20, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) An applicant for asylum need not show conclusively why persecution occurred in the past or is likely to occur in the future. However, the applicant must produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or imputed protected ground.

(2) Criminal extortion efforts do not constitute persecution "on account of" political opinion where it is reasonable to conclude that those who threatened or harmed the respondent were not motivated by her political opinion.

(3) Country profiles submitted by the Department of State's Bureau of Democracy, Human Rights and Labor are entitled to considerable deference.

FOR THE RESPONDENT: Miguel D. Gadda, Esquire

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Dina F. Haynes, Assistant District Counsel

BEFORE: Board En Banc: DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Dissenting Opinion: SCHMIDT, Chairman; ROSENBERG, Board Member.

HURWITZ, Board Member:

In a decision dated August 8, 1995, an Immigration Judge determined that deportability on the charge set forth above was established by clear, unequivocal, and convincing evidence in conformity with *Woodby v. INS*, 385 U.S. 276 (1966). The Immigration Judge denied the respondent's applications for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1994), but granted the respondent's request for voluntary departure under section 244(e) of the Act, 8 U.S.C. § 1254(e) (1994). The respondent timely appealed the decision of the Immigration Judge. The appeal will be dismissed.

## I. FACTS

The respondent is a 43-year-old native and citizen of the Philippines who entered the United States at San Francisco, California, on March 29, 1993, as a visitor for pleasure, authorized to remain in the United States until October 27, 1993. The respondent claims that she fled the Philippines because of her fear of harm from a guerrilla group known as the New People's Army ("NPA"). The respondent testified that the NPA sought her as a recruit as well as to obtain the financial support of her parents' shoe business. The respondent said that her contact with the NPA began in September 1992 and ended in February 1993, shortly before she left the Philippines.

According to the respondent's testimony, she was first approached by two NPA members in September 1992, while working at her parents' shoe store. She stated that the NPA representatives attempted to recruit her because they needed her "to help them with their costs." The respondent explained that she refused to pay "revolutionary taxes" to the NPA because she supported the government. The respondent testified that although she was never involved in any political activities, she opposed providing financial support to the NPA "because they kill people, women and children."

The respondent testified further that the NPA representatives became angry and subsequently demanded a "revolutionary tax" of 3,000 pesos at gunpoint. The respondent testified that she paid the requested amount and was informed by the NPA representatives that they expected a similar payment on a monthly basis thereafter. She continued to make monthly payments of 3,000 pesos through January 1993.

In February 1993, the NPA representatives demanded that her financial contribution double. She testified that when she told them that she was unable to provide the 6,000 pesos, the NPA members became angry and slapped and beat her. One of the NPA representatives then threatened her at gunpoint while the other member used a knife to cut her right arm. Before leaving, the NPA representatives informed her that they would return for the "tax" and failure to provide the money would result in her death. The respondent stated that she did not inform her parents that she was paying the NPA a "revolutionary tax" from their business until she was injured. She said that the injury caused her to make preparations to leave the country. She left the Philippines in March 1993.

The respondent indicated that she worked as an accountant for 15 years at a hospital in Manila during the time she was threatened by the NPA, although her encounters with the NPA occurred only at her parents' shoe store. The respondent stated that her parents are now retired and have closed their shoe store. The respondent explained that the NPA sought financial assistance generally from the businesses located in the same area as her parents' business, and she surmised that the NPA sought her out because of her position at her parents' successful business, as well as her family's high standard of living.

Included in the record is the country profile prepared by the Department of State. Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *The Philippines - Profile of Asylum Claims & Country Conditions* (June 1995) [hereinafter *Profile*]; *see also* 8 C.F.R. 208.11(a) (1996). The *Profile* reveals that "[a] large proportion of Philippine asylum applicants allege that the NPA threatens them with death or other harm for refusing to support that organization financially. In most instances the NPA is not interested in the political opinion of its intended victim but in the victim's wealth." *Profile, supra*, at 4. The *Profile* also provides evidence that the NPA's strength is at present substantially diminished. It states that the NPA has a "significant presence in only 2 percent of the 42,000 townships" within the Philippines and "[i]t is generally possible for Filipinos to seek internal resettlement." *Id.* at 4.

## II.  APPLICABLE LAW

### A.  "Persecution" Must Be "on account of" an Enumerated Ground

An applicant for asylum bears the burden of establishing that he or she meets the "refugee" definition of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). The respondent must demonstrate that she is unable or unwilling to return to, and is unable or unwilling to avail herself of, the protection of the Philippines, because of persecution or a well-founded fear of persecution "on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. Even treatment that is regarded as "morally reprehensible" is not "persecution" within the meaning of the Act unless it occurs "on account of" one of the five enumerated grounds in the Act. *Ghaly v. INS*, 58 F.3d 1425, 1431 (9th Cir. 1995).

### B.  Mixed Motive

The burden of establishing eligibility for asylum lies with the applicant. We recognized in *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996), that an applicant for asylum need not show conclusively why persecution occurred in the past or is likely to occur in the future. However, the applicant must produce evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or imputed protected ground. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992).[1] In a claim of persecution based upon political opinion (either actual or imputed), the persecution must be "on account of" the victim's political opinion, not the persecutor's. *Id*.

---

[1] Persecution for "imputed" grounds (e.g., where one is erroneously thought to hold particular political opinions or mistakenly believed to be a member of a religious sect) can satisfy the "refugee" definition. *Matter of A-G-,* 19 I&N Dec. 502, 507 (BIA 1987), *aff'd sub nom. M-A- v. INS*, 899 F.2d 304 (4th Cir. 1990).

In determining the motivation for threats or harm in an actual or imputed political opinion asylum claim, the record must be examined for direct or circumstantial evidence from which it would be reasonable to conclude that those who threatened or harmed the respondent were in part motivated by an assumption that her political views were antithetical to their cause.

## III. ANALYSIS

The respondent testified that the NPA initially approached her as part of their effort to finance their organization. She stated that when she told them that she would not provide funds because she supported the government, the NPA representatives threatened to harm her. She testified that the NPA representatives left without incident after she agreed to provide monthly financial contributions to their cause. The respondent continued providing monthly "revolutionary taxes" to the NPA without incident for several months. When the NPA demanded that the respondent double her contribution, she resisted and was harmed.

We find first that the respondent has failed to demonstrate that the abuse she suffered at the hands of the NPA was directed toward modifying or punishing political opinion. The United States Supreme Court has held that an asylum applicant must demonstrate that the persecutor inflicted the harm because of the victim's actual or imputed political opinion. *INS v. Elias-Zacarias, supra*. Although the respondent testified that she opposed the NPA, her actual political views, while relevant to the inquiry of whether she was harmed because of her political opinion, does not by itself answer the question. *Id*.

The statements and actions by the NPA, and the resulting harm, are consistent with the nonpolitical end of extorting money for their cause. The NPA's conduct towards the respondent is consistent with extortion, i.e., the illegal taking of money by anyone who employs threats, or other illegal use of fear or coercion in order to obtain the money. Cf. Desir v. Ilchert, 840 F.2d 723 (9th Cir. 1988) (holding that government-sponsored extortion may be deemed to be "on account of" the victim's political opinion when evidence reveals that persons who resisted extortion were marked as political subversives and subjected to official repression).

The issue before us is not whether the NPA levied "revolutionary taxes," but rather how the NPA demands for money should be characterized. The respondent contends that the NPA targeted her for the infliction of financial harm on account of her political opinion. However, the evidence supports the conclusion that the imposition of "revolutionary taxes" (enforced by threats of harm and enforced by actual harm) was extortion related, not to the respondent's political opinion, but rather to her ability to pay.

The reasonable inference from the respondent's testimony is that the NPA sought financial backing from business people regardless of their political

opinion. The respondent is from a family of means and was in a position to supply needed financial resources to the NPA, whose encounters with the respondent were in furtherance of this purpose. The respondent's testimony reveals that she was sought by the NPA only at her parent's place of business and that the business is now closed. She failed to provide any evidence that the NPA sought her after the business closed, or at the hospital where she worked for 15 years before leaving the Philippines. The evidence indicates that the NPA had no interest in the respondent beyond her association with her parents' business. This evidence further supports the conclusion that the NPA was motivated by the ability of the business to generate financial support.

Secondly, we find that the respondent failed to demonstrate that the NPA treated her differently from others who were similarly situated. The respondent's application indicates that the NPA's attempt to extort money from her parents' business is consistent with its illegal activities in the locality and with its solicitation of "revolutionary taxes" from other local businesses.

Additionally, available in this case is the country profile submitted by the Department of State's Bureau of Democracy, Human Rights and Labor, dated June 1995. *Profile, supra*. The *Profile* supports the conclusion that the respondent was not threatened and harmed "on account of" her political opinion but because of her resistance to pay extortion. It reveals that the NPA's practice of securing financial support by the threats of force and actual harm is motivated by the victim's wealth, not the victim's political opinion. The *Profile*, in the absence of contradictory evidence, is entitled to considerable deference. *See Kazlauskas v. INS,* 46 F.3d 902, 906 (9th Cir. 1995) (stating that country condition profiles developed by the United States State Department are "'the most appropriate and perhaps the best resource' for 'information on political situations in foreign nations'") (quoting *Rojas v. INS*, 937 F.2d 186, 190 n.1 (5th Cir. 1991).

While the harm that the respondent has described is reprehensible, the evidence presented does not support her claim that the harm was caused "on account of" her political opinion. *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993) (finding that "persecution" within the Act does not encompass all treatment that society regards as unfair, unjust, or even unlawful or unconstitutional). For example, criminal extortion efforts do not constitute persecution "on account of" the victim's political opinion where it is reasonable to conclude that those who threatened or harmed the respondent were not motivated by her political opinion. Cuevas v. INS, 43 F.3d 1167, 1171 (7th Cir. 1995) (holding that refusal to sell land despite NPA threats was based on economics, not on account of a political opinion); *see also Matter of R-*, 20 I&N Dec. 621, 623 (BIA 1992) (finding that the fact that guerrilla militants seeking operating resources from an asylum applicant in the form of material assistance and manpower may also have had a generalized political agenda is

inadequate to establish that the applicant fears persecution from them on account of political opinion).

## IV. CONCLUSION

We find no error in the Immigration Judge's determination that the respondent failed to meet her burden of showing that she suffered past persecution "on account of" her political opinion. The evidence indicates that the NPA's threats and infliction of harm directed at the respondent are appropriately characterized as extortion, not threats made on account of her political opinion.

Inasmuch as the respondent has failed to satisfy the lower burden of proof required for asylum, it follows that she also has failed to satisfy the clear probability standard of eligibility required for withholding of deportation. *See Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The evidence does not establish that it is more likely than not that the respondent would be subject to persecution on account of one of the five grounds specified in section 243(h)(1) of the Act. *See INS v. Stevic*, 467 U.S. 407 (1984). Accordingly, the appeal will be dismissed.

**ORDER:**     The respondent's appeal is dismissed.

**FURTHER ORDER:**     Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1977), the respondent is permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure to so depart, the respondent shall be deported as provided in the Immigration Judge's order.

*DISSENTING OPINION*: Paul W. Schmidt, Chairman

I respectfully dissent.

I agree with my dissenting colleague, Board Member Rosenberg, insofar as she concludes that the respondent has demonstrated a well-founded fear of persecution under the standards set forth in *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). On the facts established by the respondent, a reasonable person in the respondent's circumstances would have an objective basis to believe that the harm she suffered at the hands of the New People's Army ("NPA") was, at least in part, on account of her expression of opposition to the political aims of the NPA. I would remand the record for further inquiry into whether circumstances in the Philippines with respect to the NPA have changed to the extent that the respondent no longer has an objective basis for fearing persecution or whether internal relocation within the Philippines is a reasonable possibility for avoiding further persecution in the respondent's case. *See Matter of H-,* 21 I&N Dec. 337 (BIA 1996).

Consequently, I respectfully dissent from the decision to dismiss the respondent's appeal.

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

The uncontroverted evidence in this case establishes that in September 1992, the respondent was confronted in her parents' store by members of the New People's Army ("NPA"), a group of self-proclaimed communist insurgents. They attempted to recruit her to join their anti-government organization. The respondent adamantly refused to join, stating that she was "progovernment" and that she opposed the group because they were killers of women and children. She testified that "[the NPA] get mad at me. They pointed a gun at me and then I thought they were going to kill me because I argued with them that I don't want their . . . organization because they kill people, women and children."

Fearing that she would be killed, the respondent offered to pay a "revolutionary tax" to satisfy their demands for support and participation. The NPA agreed and demanded payment of 3,000 pesos per month in lieu of her joining them, which they regularly collected over the next 4 months. When, in February 1993, the group insisted upon a doubling of the payment, the respondent replied that she was unable to provide that amount. NPA members then slapped her, beat her, threatened her at gunpoint, and slashed her arm with a knife, leaving her with a scar that she still bears today. They warned that failure to pay the increased amount would result in her death. Soon thereafter, the respondent fled the Philippines and sought refuge in the United States.

The majority commits a fundamental error in dismissing the respondent's credible testimony of threats, beating, and physical suffering inflicted upon her by the NPA as nothing more than "extortion not on account of her political opinion." *Matter of T-M- B-*, 21 I&N Dec. 775 (BIA 1997). Based upon this credible evidence, I conclude that the NPA's actions were motivated, at least in part, by the respondent's expressed political opposition and resistance to the group's recruitment efforts. *See INS v. Elias-Zacarias*, 502 U.S. 478 (1992) (recognizing that a persecutor may be motivated to harm the victim for more than one reason); *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988); *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996). In light of the testimony presented and the avowedly political aims of the persecutor, I find puzzling, if not myopic, the majority's ready conclusion to the contrary.

## I. PERSECUTION ON ACCOUNT OF POLITICAL OPINION

This is not a case of mere nonpolitical extortion. *Cf. Aruta v. INS,* 80 F.3d 1389, 1392-93 (9th Cir. 1996) (finding ineligibility for asylum where an applicant failed to present any evidence that she had a political opinion or that

she or her family ever was targeted, threatened, or harmed by rebel groups for any reason). Retribution for refusal to give in to extortion is not necessarily devoid of political content. *Desir v. Ilchert, supra*, at 728.[1] I am unpersuaded by the majority's conclusion, not only because their analysis is contrary to controlling law, but also because they fail to explain why they conclude that the threats and harm suffered by the respondent resulted from a nonpolitical motive, and that theirs is the only reasonable characterization of the facts.

## A.  Inferences Concerning the Persecutor's Motives

An asylum applicant does not bear the unreasonable burden of showing the exact motivation of the persecutor when different reasons for actions are possible, so long as a reasonable person would fear that the persecution was on account of one of the five grounds enumerated in the statutory definition of a refugee in the Act. *Matter of S-P-, supra*, at 489; *see also INS v. Elias-Zacarias, supra.* The courts have long recognized that persecutors are not likely to provide their victims with evidence of their motives. *Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1284-88 (9th Cir. 1984).

To determine if the respondent's well-founded fear is on account of persecution, we need to examine the record for direct or circumstantial evidence from which it would be reasonable to conclude that those who threatened or harmed the respondent were in part motivated by an assumption that her political views were antithetical to their cause. *Matter of S-P-, supra*, at 9-10; *see also Matter of Fuentes*, 19 I&N Dec. 658, 662 (BIA 1988) (recognizing that there can be more than one possible basis for persecutor's actions, and holding that alien's task is simply to demonstrate the reasonableness of a motivation which is related to one of the enumerated grounds); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987).

The majority acknowledges that an alien may establish eligibility for asylum where the evidence reflects that it is reasonable to believe that the harm suffered was motivated, at least in part, by an actual or imputed protected ground. *See Matter of T-M-B-, supra*, at 777 (citing *Matter of S-P-, supra); see also INS v. Elias-Zacarias, supra.* However, according to the majority, the respondent's interactions with the NPA were wholly devoid of political content or motivation. They contend that the threats and abuse inflicted by members of the group are "consistent with the nonpolitical end of extorting money for their cause." *Matter of T-M- B-, supra*, at 778. The majority dubs

---

[1] Although *Desir v. Ilchert, supra*, involved extortion and violence by a group associated with the government of Haiti under a political system referred to by the court as a "kleptocracy," the source of such persecution may be nongovernmental and "may also emanate from sections of the population that do not respect the standards established by the laws of the country concerned." Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 65, at 17 (Geneva, 1992)("*Handbook*"); *see also Lazo-Majano v. INS*, 813 F.2d 1432 (9th Cir. 1987).

its interpretation of the group's motivation a "reasonable inference" based on the respondent's testimony. *Id*.

Yet the evidence demonstrates that the NPA's actions also are consistent with the politically motivated goals of punishing and overcoming the respondent's political opposition and securing her allegiance to their cause through intimidation and physical abuse. *See Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985), *modified on other grounds, Matter of Mogharrabi, supra*. Indeed, the likelihood that the NPA harbored a persecutory motive toward the respondent is substantiated by evidence that she bluntly declared to the NPA recruiters that she was unwilling to accede to the group's demands because "I am progovernment." INS v. Elias-Zacarias, supra; see also Osorio v. INS, 18 F.3d 1017, 1025 (2d Cir. 1994) (stating that the political opinion actually held by or imputed to the victim is essential to determining that persecution threatened or suffered is on account of political opinion).

In *Singh v. Ilchert*, 69 F.3d 375, 379 n.1 (9th Cir. 1995), the United States Court of Appeals for the Ninth Circuit rejected the argument that a Sikh asylum applicant was not tortured on account of political opinion, because the "real motive" was to gather information about Sikh separatists. The court stated that "[w]hile that may have been one motive of the police," an additional motive was that the police refused to believe the applicant when he insisted that he was not a Sikh separatist. *Id.; see also Rodriguez-Roman v. INS*, 98 F.3d 416, 431 (9th Cir. 1996) (holding that the Board erred in concluding that severe punishment an alien would suffer upon return to Cuba following illegal departure would be merely criminal prosecution, rather than persecution on account of political opinion); *Osorio v. INS, supra,* at 1028 (holding that "[t]he plain meaning of the phrase 'persecution on account of the victim's political opinion,' does not mean persecution *solely* on account of the victim's political opinion" (quoting *INS v. Elias- Zacharias, supra*, at 482 . . . and that "the conclusion that a cause of persecution is economic does not necessarily imply that there cannot exist other causes of the persecution").

In *Matter of S-P-, supra*, we made clear our acceptance of a "mixed motive" theory as a basis for establishing that mistreatment by a persecutor was "on account of" a protected ground. Although the respondent, under threat of death, initially paid the NPA's "revolutionary tax" in lieu of joining their group, she continued to voice her vehement and vocal political opposition.[2] When finally she refused based on her political opposition, the NPA doubled the amount and attacked her.

---

[2] There is no evidence that the respondent's reason for resisting and ultimately refusing to pay an increased "revolutionary tax" was because she didn't want to give up her money or objected to the NPA's methods of raising funds. Thus, this is not a situation in which the victim's reasons for not cooperating with the alleged persecutor are subject to speculation that her resistance was for nonpolitical reasons. See, e.g., *INS v. Elias-Zacarias, supra*, a case upon which the majority relies.

By construing the record to establish only that the NPA acted against the respondent out of a desire for money, the majority has impermissibly rejected credible evidence which establishes the reasonableness of the respondent's contentions that the NPA's motive in threatening and harming her was on account of her political opposition. *See Cardoza-Fonseca v. INS*, 767 F.2d 1448, 1453 (9th Cir. 1985) (noting that establishment of objective facts through testimony alone does not make them any less objective), *aff'd*, 480 U.S. 421 (1987). However, in determining the respondent's eligibility for asylum on the basis of objective facts which raise the possible coexistence of a political and a nonpolitical motive for the persecutor's actions, we are obliged to grant her the benefit of the doubt. *See Matter of S-M-J-*, 21 I&N Dec. 722 (BIA 1997).[3]

Any inferences drawn concerning the implausibility of factual allegations must themselves be supported by substantial evidence. *Aguilera-Cota v. INS,* 914 F.2d 1375, 1381 (9th Cir. 1990). It cannot be said that there is substantial evidence to find the respondent's contentions that the NPA had a political reason for persecuting her are implausible. Under a mixed motive standard, a reasonable inference cannot be drawn to the exclusion of other legitimate inferences. The confluence of a desire not to be the victim of extortion and the public, political opposition to the NPA's ideology and its operations does not undermine the political nature of a resister's opposition, and should not affect our characterization of the punishment she may face. Providing one does not reason from a conclusion of ineligibility, the totality of the evidence in the record supports an equally or more persuasive "reasonable inference" that the NPA acted from a desire to simultaneously further both its political and nonpolitical goals.

## B.  Consideration of Mixed Motive Factors

Although *Matter of S-P-, supra*, involved a claim of persecution by government authorities, several of the factors we articulated in that case are useful in assessing motivation in claims against nongovernmental groups such as the NPA.[4] Thus, a determination of whether the NPA's conduct in relation to its extortion or recruitment qualifies as persecution on account of an enumerated ground depends upon the nature of the demands, warnings or threats asserted, whether such threats are accompanied by physical harm or abuse, and the type of harm inflicted. *Matter of S-P-, supra*. Specific factors to be

---

[3] See also Handbook, supra, paras. 203-204, at 48. In addition, where an applicant is unable to provide documentary or other support for all of her statements, yet provides a credible account, she should be given the benefit of the doubt. *Id*. para. 196, at 47.

[4] To ascertain whether the abuse inflicted was intended to punish or modify a respondent's political views, rather than merely for reasons of extortion, we examine: (1) indications that the threats or abuse were directed toward modifying or punishing opinion rather than conduct; (2) statements or abuse out of proportion to nonpolitical ends; and (3) treatment of others who were confronted by the agent of persecution. *Matter of S-P-, supra*.

examined against the political backdrop of the Philippines also may include the extent to which the victim's views or affiliations, social class or status (e.g., as a business owner or merchant), religion, or nationality appears to have been a consideration in the NPA's acts of extortion and persecution.

For example, where the evidence reflects no more than mere monetary demands by the NPA, made solely in order to extort funds for their cause, such acts most likely will not qualify as persecution on account of a protected ground under the Act. *See Aruta v. INS supra; Cuevas v. INS*, 43 F.3d 1167, 1171 (7th Cir. 1995) (finding that dispute with NPA was based on economic factors, not on the applicants' political opinions or absentee landlord status). However, beatings, imprisonment, or assault for the purpose of extortion may constitute politically motivated persecution. *See, e.g., Desir v. Ilchert, supra*, at 728. (finding that "the treatment endured by Desir," resulting from his failure to make extortion payments, "is more properly understood as motivated by 'political' rather than 'personal' interests.") Thus, where such demands are accompanied by threats and intimidation, or retribution for resistance, the NPA's activities may, in certain circumstances, support finding a well-founded fear of persecution on account of a political opinion.

Where threats of harm actually are carried out, reasons for the NPA's actions demand even closer scrutiny. In *Matter of S-P-, supra*, we found that the level of harm is a significant factor which may be indicative of the persecutor's motive. See supra note 4. As the extreme nature of the threats or the severity of the methods used to enforce extortion demands increase, so increases the likelihood that a victim can establish that she qualifies for asylum. When an applicant has manifested political opposition and experienced a significant level of harm, the presence of another nonpolitical motive for a group's actions does not extinguish, but supports, her claim. *See Singh v. Ilchert, supra,* at 379 n.1; *see also Desir v. Ilchert, supra,* at 729; *Bolanos-Hernandez v. INS, supra*, at 1284-88.

The majority concedes that the respondent suffered an escalating level of abuse, which culminated in her being cut with a knife and threatened with death after she expressed opposition to the NPA and its activities and resisted their demands. *Matter of T-M-B-, supra*. In fact, the majority describes the harm experienced by the respondent as "reprehensible," yet finds that such harm was not, even in part, on account of the respondent's actual or imputed political opinion. *Id*. at 6. Without providing a reasoned explanation for their determination, other than to look for support to the Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, *The Philippines - Profile of Asylum Claims & Country Conditions* (June 1995) [hereinafter *Profile*], the majority concludes that the NPA's actions constituted no more than a criminal offense motivated exclusively by nonpolitical aims.

In the case of an organization such as the NPA, harm or threats of harm directed at an individual who specifically opposes their ideology and resists their demands under the circumstances related here, cannot simply be

dismissed as enforcement of punishment for having resisted "mere extortion." I find it difficult to conclude that an avowedly political organization with a political agenda can be said to so surgically differentiate its motives and actions.

## C. Persecution Which is "Extortion Plus"

Mindful of the Boston Tea Party, I note that reasonable minds might differ over whether "mere extortion" in the form of a "revolutionary tax," standing alone, is or is not a political act, and whether or not resistance to such taxation could be expected to be perceived as an expression of political opinion. *See Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969) (holding that deliberate imposition of substantial economic harm can support a claim of political persecution); *Desir v. Ilchert, supra,* at 728. However, we need not resolve those questions here, as the respondent's payment of the "revolutionary tax" followed the NPA's attempt to recruit her to their ranks.

The case before us is an example of what we might call "extortion plus." Although the NPA demanded a "tax" and the respondent paid it, the evidence suggests that something more than the NPA's desire for the respondent's continued payments motivated the threats and harm they imposed. *Cf. Aruta v. INS, supra.* The evidence establishes that, in response to the NPA's efforts to recruit her, the respondent explicitly stated her political opposition to the group and her disapproval of their methods and goals. The Ninth Circuit recognizes that forcible recruitment can constitute persecution. *See Maldonado-Cruz v. INS,* 883 F.2d 788, 791 (9th Cir. 1989), *reversing Matter of Maldonado-Cruz*, 19 I&N Dec. 509 (BIA 1988).[5] Such resistance to recruitment is sufficient to support a well-founded fear of persecution. *See Aguilera-Cota v. INS, supra*, at 1379-80 (9th Cir. 1990); *Artiga-Turcios v. INS*, 829 F.2d 720, 722-23 (9th Cir. 1987).

Even were we not addressing a case which arises within the jurisdiction of the Ninth Circuit, our precedent would not foreclose our characterizing either the respondent's resistance to recruitment as political or the harm she suffered as being politically motivated. The basis for our conclusion that recruitment or punishment for resisting it cannot constitute persecution is founded in the principle that sovereign nations have a right to require military service of their citizens and to impose military discipline. *Matter of A-G-,* 19 I&N Dec. 502, 506 (BIA 1987); *see also Kaveh-Haghigy v. INS,* 783 F.2d 1321 (9th Cir. 1986). This rule was extended to nongovernmental military forces by the Board in *Matter of Maldonado-Cruz, supra.*

---

[5] The Board is bound to follow the law of the United States Court of Appeals for the Ninth Circuit, in which this case arises. *See Matter of K-S-*, 20 I&N Dec. 715, 719-20 (BIA 1993); *Matter of Anselmo*, 20 I&N Dec. 25, 31-32 (BIA 1989); *see also NLRB v. Ashkenazy Prop. Mgmt. Corp.*, 817 F.2d 74 (9th Cir. 1987).

The situation in the Philippines is not one involving claims made by soldiers in the context of a civil war, and the NPA is not exerting any sort of justifiable "discipline" over the respondent in threatening and harming her. This case does not involve military- type recruitment or punishment in the form of military discipline, but rather political recruitment in which the NPA demanded that the respondent join them as an expression of her allegiance to the organization and to help further their political goals. *Cf. Matter of Maldonado-Cruz, supra,* at 514-16. In addition, at the time we decided *Matter of A-G-, supra*, and *Matter of Maldonado-Cruz, supra,* we had not decided *Matter of S-P-, supra*, which expressly recognizes that a persecutor may harbor a dual motive.

It is reasonable to conclude that an individual's outspoken resistance to the NPA's demands on political grounds would be interpreted by its members as an offensive "belief or characteristic" which the group "seek[s] to overcome through punishment of some sort." *Matter of Mogharrabi, supra*, at 446 (citing *Matter of Acosta, supra*). It is also reasonable to infer that resistance of this nature provoked the NPA to resort to threats, intimidation, and actual harm—to overcome the respondent's expression of an opposing political view, as well as to enforce the group's demands. Under these circumstances, the Board cannot simply conclude that the group acted solely from a nonpolitical desire to extort money, and not also with the aim of punishing the respondent for her political opinion. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987); *Matter of S-P-, supra.*

## II. CONSIDERATIONS OF COUNTRY CONDITIONS

The majority also bases its denial of the respondent's asylum claim on the June 1995 Department of State *Profile* which purports to address relevant country conditions in the Philippines having a bearing on the plausibility of the respondent's claim. *Matter of S-M-J-, supra*. The *Profile* recognizes that the NPA is a communist insurgent organization that resorts to killing and violence to achieve its political goals. *Profile, supra*, at 4. It recognizes that the NPA includes a faction called the Alex Broncayo Brigade which is characterized as "an urban guerrilla group." *Id.* at 5. The *Profile* does not deny that the NPA is able and motivated to engage in persecution on account of the victim's political opinion. *Id.* at 3-5. Nevertheless, the majority suggests that, even were the respondent to face persecution on account of her political opinion, she could avoid future persecution at the hands of the NPA simply by relocating within her home country. *Id.* I do not agree.

### A. "Country-wide" Persecution and Reasonable Internal Relocation

There is no statutory, constitutional, or international requirement that an asylum applicant demonstrate "country-wide persecution." "[T]here is also no reason . . . why the fear of persecution should relate to the whole of the

asylum-seeker's country of origin . . . ." Guy Goodwin Gill, *The Refugee In International Law 42* (1983); *see also* Ignatius, *Asylum: Country-Wide Persecution,* 21 Nat'l Immigr. Project of the Nat'l Law. Guild, Inc., Immigr. Newsletter, No. 1 (1993).

While related, the requirement that a refugee must be unwilling or unable to return to one's country to qualify as a refugee in need of international protection, and the consideration of whether it would be unreasonable to expect a refugee to relocate internally, are not as entwined as our prior decisions may have made it appear. Nor is there a presumption that the absence of affirmative evidence demonstrating that the persecutor operates nationwide means there is no basis for the victim to have a well-founded fear of persecution. *Damaize-Job v. INS*, 787 F. 2d 1332, 1336 (9th Cir. 1986); *cf. Matter of R*-, 20 I&N Dec. 621, 627 (BIA 1992) (suggesting that the absence of evidence that there *is* persecution country-wide means that there *is not* persecution country-wide).

The *Handbook* makes clear that proof of country-wide danger is not an absolute requirement, stating that "[t]he fear of being persecuted need not always extend to the *whole* territory of the refugee's country of nationality." *Handbook, supra*, para. 91, at 21. For example, in the case of government-sponsored persecution suffered in the past, the courts have imposed a presumption of nationwide persecution, requiring the Immigration and Naturalization Service to show that the "persecutive actions are truly limited to a clearly delineated and limited locality and situation." *See Abdel-Masieh v. United States INS,* 73 F.3d 579, 587 (5th Cir. 1996); *see also Singh v. Ilchert,* 63 F.3d 1501 (9th Cir. 1995); *Matter of H-*, 21 I&N Dec. 337 (BIA 1996).

Where there is some basis to conclude that persecution would be confined to a local area or when the persecutor is a nongovernmental force, consideration must be given to whether that authority has the inclination and ability to persecute the alien throughout the home country. *Matter of H-, supra,* at 349 n.6; *see also Singh v. Moschorak*, 53 F.3d 1031, 1034 (9th Cir. 1995); *Quintanilla-Ticas v. INS*, 783 F.2d 955, 957 (9th Cir. 1986) (finding the applicant ineligible where the danger of persecution was limited to a single village); *Matter of Fuentes, supra.* Although the NPA is a nongovernmental force, the fact that the NPA confronted the respondent only at her store and not at her place of other employment does not suggest either that the nature of their interest in her was not political or that it was confined to a local area. *Damaize-Job v. INS, supra.*

The standard for determining whether an asylum applicant can relocate to a zone of safety in the country of persecution is "reasonableness." As addressed by the *Handbook, supra*, para. 91, at 21-22, "for various reasons it may be unreasonable to expect the asylum-seeker to move internally." (Emphasis added.) *See also* Guy Goodwin Gill, *supra*. The internal relocation principle has been interpreted as being a limited restriction, applicable to persons who "can genuinely access domestic protection and for whom the

reality of protection is meaningful." J. Hathaway, *The Law of Refugee Status* 134 (1991). Determinations of "reasonableness" include consideration of likely financial or logistical barriers to internal relocation, as well as the circumstances which fail to satisfy civil, political, and socioeconomic human rights norms, or place the refugee in illusory or unpredictable situations. *Id*.

## B. Relevance of the Department of State Country Profile

The statistics cited by the majority—that the NPA boasts a "significant presence" in only 2 percent of the country's townships—offers little insight into the specific threat faced by the respondent. *Matter of T-M-B-, supra*, at 777.

The June 1995 *Profile* specifies that it is not the townships, but the individual provinces, extending from north to south throughout the islands, in which the NPA is known to be operating. *Profile, supra*, at 4. The *Profile* expressly includes Luzon, which includes Manila, a major population center and the area in which the respondent worked. *Id*. It also includes Mindanao in the far south, and provinces in the central section of the archipelago. *Id*. One of the only areas in Luzon which the *Profile* contends is not beset by NPA activity, for example, is Catanduanes, an island. *Id*. Napoleon's exile notwithstanding, I do not consider it "reasonable" to expect the respondent to relocate to a small, remote island.

Furthermore, that some areas may have a "significant presence" and others a minimal presence does not support a conclusion that the danger to the respondent can be alleviated by her internal relocation. As noted, the Ninth Circuit has not required actual acts of persecution nationwide, but has looked to the persecutors' intent to persecute in a broad geographic area. *Damaize-Job v. INS, supra*, at 1336; *see also* Ignatius, *supra*. Although noting that it is "generally possible" for victims of persecution to relocate internally, the *Profile* recognizes the NPA is capable of persecuting persons with credible fears of persecution. *Profile, supra*, at 4. A "general possibility" that, assuming it was reasonable to do so, the respondent might relocate successfully, is not sufficient to extinguish her well-founded fear under the standard in *INS v. Cardoza-Fonseca, supra.*

Thus, the statistical "data" contained in the *Profile* is relatively unhelpful in deciding this specific case. In addition, I view aspects of the "information" contained in the *Profile* to be unrelated to the purported role of the Department of State in advising on asylum claims, and I find this inappropriate commentary to undermine any deference that we might ordinarily extend to the *Profile*.

The country profile may be an appropriate, and even an excellent, resource for information on political situations in foreign nations. *Kazlauskas v. INS,* 46 F.3d 902, 906 (9th Cir. 1994). However, in the absence of any evidence qualifying the Department of State to discern motive or opine regarding the

NPA's reasons for harming their victims, I see no basis to accept or rely upon their conclusions concerning the "on account of " element in the statutory definition. *See* section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (1994); *cf. Matter of S-M-J-, supra*.

I believe this to be an adjudicative or judicial function. Moreover, although noting that "in most instances," the NPA is not interested in its victim's political opinion, the *Profile* recognizes that the NPA does not target its victims only because of their wealth. *Profile, supra*, at 4. In addition, the *Profile* suggests that the frequency of Philippine asylum seekers claiming to have had relatives who were killed might raise credibility questions in view of the decline of NPA activity. *Profile, supra*, at 3. Again, in my view, the Department of State exceeds its function in providing such "advice" in the *Profile*. Even if such a suggestion was within the competency of the Department of State to make, generalized and unsupported conclusions which appear to be derived only from review of other applications are entitled to little weight in determining credibility in any one specific case.

What is more, such a contention happens to be erroneous as a matter of law, as it is well established that where a number of similarly situated individuals face a similar type of harm, this does not weaken, but rather strengthens, its political character. *See Bolanos-Hernandez v. INS, supra; Matter of Mogharrabi, supra; see also* 8 C.F.R. § 208.13(a)(2)(i) (1996) (recognizing "pattern and practice" evidence as bolstering an individual's well-founded fear of persecution). Although a country profile may be a primary resource for information on "political situations," such observations do not pertain to political factors, but to psychological and evidentiary assessments, not necessarily within the expertise of the foreign service. *Kazlauskas v. INS, supra*.

In sum, I do not believe that the evidence concerning country conditions contained in the *Profile* indicates that the NPA is not capable of operating throughout the archipelago, or that the respondent could avoid further persecution by relocating within the Philippines. Her uncontroverted testimony concerning the threats and harm she has already experienced constitutes objective evidence, which directly contradicts the apparent presumption in the *Profile* to the contrary. There is no evidence that the reduction in the NPA's force or areas of operation (which is indicated by the June 1995 *Profile* to have begun after the NPA's *peak* in 1988), accelerated so dramatically between 1993, when the actual threats and harm to the respondent occurred, and today, that the NPA no longer is capable of persecuting the respondent. Even if the NPA would not pose a threat to the respondent in certain locations, there is no evidence in the record which indicates it would be reasonable to expect her to relocate internally.

## III. CONCLUSION

Therefore, I conclude that the record lacks substantial evidence to find that the respondent's fear of persecution from the NPA on account of her political opinion is not reasonable under the test in *INS v. Cardoza-Fonseca, supra*, or that internal relocation would be either feasible or effective. The respondent declared her political opposition to the NPA directly to them; she refused first to join the NPA and later to make the payments they demanded. The death threats and level of physical harm inflicted on her do not support the conclusion that the NPA's only interest in the respondent was as a source of funds to support its revolutionary activities. The escalation of abuse following the respondent's resistance to their demands establishes that the NPA acted, at least in part, from a desire to punish the respondent for her open political opposition and resistance to their organization. Accordingly, I would sustain the respondent's appeal and grant her application for asylum.