# In re J-J-, Applicant

*Decided July 31, 1997*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) A motion to reconsider a decision of the Board of Immigration Appeals must be filed not later than 30 days after the mailing of the decision, or on or before July 31, 1996, whichever date is later. Only one motion to reconsider may be filed, and there is no exception to the time bar imposed on such motions.

(2) Only one motion to reopen is allowed and must be filed with the Board not later than 90 days after the date on which the final administrative decision was rendered, or on or before September 30, 1996, whichever date is later. An exception exists for motions to reopen to apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality, if evidence is presented that is material and was not available and could not have been discovered or presented at the former hearing.

(3) An appeal or motion is deemed filed when it is received at the Board, irrespective of whether the alien is in custody.

(4) The Board's power to reopen or reconsider cases sua sponte is limited to exceptional circumstances and is not meant to cure filing defects or circumvent the regulations, where enforcing them might result in hardship.

FOR THE APPLICANT: Ann A. Ruben, Esquire, Philadelphia, Pennsylvania

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Jeffrey T. Bubier, Assistant District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, and GUENDELSBERGER, Board Members. Concurring Opinion: VILLAGELIU, Board Member. Dissenting Opinion: ROSENBERG, Board Member.

SCHMIDT, Chairman:

This case was last before us on August 8, 1995, when we dismissed the applicant's appeal from the decision of an Immigration Judge, denying the applicant's requests for asylum in the United States and withholding of deportation to Liberia. The applicant has now filed both a motion to reopen exclusion proceedings before the Board and a motion to reconsider our decision of August 8, 1995.

The motion to reconsider is untimely, and we are therefore without jurisdiction to consider it. 8 C.F.R. § 3.2(b)(2) (1997). The motion to reopen is likewise untimely. 8 C.F.R. § 3.2(c)(2) (1997). There remains the issue, however, of whether the untimely motion to reopen falls within the regulatory exception allowing for reopening out of time in order to apply for asylum based on changed circumstances arising in the country of nationality. 8 C.F.R. § 3.2(c)(3)(ii) (1997). We hold that this motion to reopen does not fall within the changed circumstances exception, and it will therefore be denied.

## I. PROCEDURAL HISTORY

The applicant is a native and citizen of Liberia who arrived at New York's John F. Kennedy Airport on September 2, 1994. He surrendered a fraudulent passport to immigration authorities and requested asylum in the United States. The applicant was issued a Notice to Applicant for Admission Detained/Deferred for Hearing Before Immigration Judge (Form I-122) advising him of his apparent excludability under section 212(a)(7) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(7) (1994), for failure to possess a valid visa or travel documents.

At his exclusion hearing on March 23, 1995, the applicant conceded excludability but applied for asylum and withholding of deportation pursuant to sections 208(a) and 243(h) of the Act, 8 U.S.C. §§ 1158(a) and 1253(h) (1994). The Immigration Judge denied both requests, concluding that the applicant did not establish either a well-founded fear or clear probability of persecution. On August 8, 1995, the Board dismissed the applicant's appeal.

Acting pro se, the applicant filed a "Motion to Reopen and/or Reconsideration" with the Board 14 months later, on October 2, 1996. Thereafter, on October 21, 1996, the applicant's prior attorney filed a second motion to reconsider, arguing that the applicant did establish a well-founded fear of persecution, based on the facts alleged in the 1994 asylum application. The Board granted a stay of deportation on January 23, 1997, pending consideration of the instant motions.[1]

## II. MOTION TO RECONSIDER

In his motion to reconsider, the applicant argues that the Immigration Judge erred in doubting his credibility or in acknowledging the dangers of

---

[1] While a motion to reopen seeks a second review of a case by the Board based on new or previously unavailable evidence, a motion to reconsider "questions the Board's decision for alleged errors in appraising the facts and the law." 1 C. Gordon et al., *Immigration Law and Procedure* § 3.05[7][a], at 3-75 (rev. ed. 1997). When the Board reconsiders a decision, it reexamines that decision "in light of additional legal arguments, a change of law, or perhaps an argument or aspect of the case which was overlooked." Gerald S. Hurwitz, *Motions Practice Before the Board of Immigration Appeals,* 20 San Diego L. Rev. 79, 90 (1982) (footnote omitted); *see also Matter of Cerna*, 20 I&N Dec. 399 (BIA 1991).

Liberia's civil war. The applicant further argues that the Board applied an incorrect standard to the asylum claim. We are without jurisdiction to consider these arguments.

Under the regulations at 8 C.F.R. § 3.2(b)(2), promulgated on April 29, 1996, and effective July 1, 1996, a motion to reconsider a Board decision must be filed not later than 30 days after the mailing of the Board decision, or on or before July 31, 1996, whichever date is later. Only one motion to reconsider may be filed, and there is no exception to the time bar imposed on such motions. *Id*. As the Board rendered a decision in this case on August 8, 1995, reconsideration of the decision would be barred after July 31, 1996. The applicant's pro se motion to reconsider filed on October 2, 1996, and his motion to reconsider filed by counsel on October 21, 1996, are not timely filed and must therefore be denied.

## III. MOTION TO REOPEN

The applicant also seeks reopening to present evidence of worsening conditions in Liberia that he believes will persuade the Board to change our prior decision and grant him asylum. Pursuant to the regulations at 8 C.F.R. § 3.2(c)(2), only one motion to reopen is allowed and must be filed with the Board not later than 90 days after the date on which the final administrative decision was rendered, or on or before September 30, 1996, whichever date is later. The applicant's motion to reopen, filed on October 2, 1996, is untimely.

The numerical and temporal limitations set forth in 8 C.F.R. § 3.2(c)(2), do not, however, bar motions to reopen to apply or reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality, if such evidence is material and was not available and could not have been discovered or presented at the former hearing. 8 C.F.R. § 3.2(c)(3)(ii). The motion must state the new facts to be proved and must be supported by evidentiary material.

The applicant alleges in his motion that he can present new and material evidence that will show he does have a well-founded fear of persecution in Liberia based on the increased ethnic and political violence in that country. The applicant states in his motion that if he is deported to Liberia, he will be in danger, as are many other people there, on account of the fighting between rival tribal and political factions. The applicant's motion is supported by a copy of his 1994 asylum application, and by several articles on Liberia, including Amnesty International reports of 1995, decrying human rights abuses committed by all factions of the war, and reports of May and April 1996 which discuss the problem of thousands of civilians fleeing Liberia after the resumption and intensification of the civil war, despite an August 1995 peace agreement. A civil war has been raging in Liberia since December 1989.[2]

---

[2] Although the Attorney General has included Liberia in the Temporary Protected Status ("TPS") program authorized by section 244A of the Act, 8 U.S.C. § 1254a (1994), for certain

The Immigration and Naturalization Service opposes the applicant's motion to reopen, arguing that the new evidence presented by the applicant is not material and would not affect the prior decision of the Board.

## IV. THE ASYLUM CLAIM

At his exclusion hearing on March 23, 1995, the applicant testified that he operated a small electrical appliance store in Liberia. He related that on September 20, 1992, he was forcibly recruited from his store by a guerrilla organization know as the National Patriotic Front of Liberia ("NPFL"), led by Charles Taylor. Others in the town who had refused to join the organization were shot. Along with other recruits, he was sent to a training camp in the Ivory Coast for 3 months. He then returned to Liberia to fight the other guerrilla groups, all of whom were vying for power in a multi-factional civil war following the death of Liberia's last president. The applicant testified that he fought with the group, planting bombs close to military tanks and engaging in combat fire in different battles for nearly 18 months following training. After a time, viewing the war as unfair, he sought to escape, despite his fear of the consequences. Others who had tried to escape had been killed.

In May 1994, while encamped in the Ivory Coast, the applicant managed to escape with the help of an acquaintance who secreted the applicant aboard a ship. Once at sea, the applicant was discovered, but the captain knew the applicant's mother and agreed to help him. When the ship docked in Singapore, the captain took the applicant's picture and asked him for $1,000. A few days later, the captain gave the applicant an American passport and took him to the airport.

The applicant testified at his hearing that he would be killed if he returned to Liberia, because the war had gotten worse and because Charles Taylor would consider him a deserter of his group. In his decision, the Immigration Judge held that forced recruitment of an individual by guerrilla forces does not constitute persecution if the guerrillas seek to make the person a member of their group, rather than harm him because he possesses a characteristic they find offensive and wish to overcome. The Board agreed, concluding that the applicant had not shown that the NPFL had any interest in his political opinions, that he ever expressed any specific opinions, or that he deserted the guerrillas based on his refusal to engage in human rights abuses condemned by the international community. *INS v. Elias-Zacarias*, 502 U.S. 478 (1992);

countries with ongoing armed conflict or environmental disaster, the applicant did not qualify to register for the benefits of this program, as he had not been "continuously physically present" in the United States since March 27, 1991, and was not in valid immigrant or nonimmigrant status during the original registration period. On April 7, 1997, however, the Attorney General "redesignated" Liberia in the TPS program and made TPS available to eligible Liberians who have continuously resided in the United States since June 1, 1996, and who have been continuously physically present in the United States since April 7, 1997. 61 Fed. Reg. 8076 (1996). The applicant may therefore now qualify to participate in this program.

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). The Board found that the applicant had simply not produced evidence from which it would be reasonable to believe that the harm he suffered was motivated by his race, religion, nationality, membership in a particular social group, or political opinion. *Matter of Dass*, 20 I&N Dec. 120 (BIA 1989); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). The Board held that the applicant was conscripted by the NPFL as a soldier in its cause, and not because of his desire to remain neutral in the conflict in Liberia or because of his ethnicity as an Americo-Liberian. The issue now is whether the conditions in Liberia have materially changed to the extent that the applicant's asylum claim, which was previously found not to constitute persecution, could now be considered persecution as defined in the Act.

## V. CHANGED CIRCUMSTANCES ARISING IN LIBERIA

The applicant contends in his motion that a much more dangerous, chaotic, and violent situation exists in Liberia now than at the time the Board dismissed his appeal in 1995. The evidence submitted by the applicant indicates that the rival factions have continued to commit human rights violations and have continued to fight despite signed peace agreements. The applicant argues that if he is forced to return to Liberia, he may have to participate in some of these violations. He also points to the ongoing mass exodus of citizens from war-torn Liberia.

The documents attached to the applicant's brief indicate that the situation in Liberia remains volatile. Some of the evidence, such as a March 1996 letter from an attorney at the United Nations High Commissioner for Refugees, who was lending an opinion in another alien's asylum claim, indicates that Liberia has been in turmoil since 1989. In 1990, the Economic Community of West African States sent a cease-fire monitoring group to serve as regional peacekeepers in response to the ferocious slaughter of civilians and the burning and looting of villages. Nevertheless, guerrilla groups continued to gain ground. In 1993, Liberia's three main factions entered into a peace agreement, attempting to resolve their political differences, disarm rebel factions, and hold elections. The agreement proved to be ineffectual and resulted in renewed combat, with atrocious abuses against civilians carried out by all sides, including fighters of Charles Taylor's NPFL. In 1994, a coalition government made efforts to once again implement the peace agreement, but that group was undermined by political wrangling and renewed factional fighting. Another peace agreement forged in September 1994 also proved to be unsuccessful. In August 1995, a new peace agreement was signed, but reports once more showed it to lack promise. The situation in Liberia remained tense, and people were fleeing the renewed fighting. Recent newspaper reports, however, indicate that several days ago, on July 20, 1997, Charles Taylor was elected President of Liberia after fair and open elections, conducted pursuant

to the most recent peace agreement. *See* Donald G. McNeil, Jr., *Liberia Gets a Fair Vote, Courtesy of Unfree Neighbors*, N.Y. Times, July 22, 1997, at A9.

In short, a review of the documents presented by the applicant does not show materially changed circumstances in Liberia since the Immigration Judge's decision in this case. The only significant changes evident from the applicant's motion are (1) that more factions are involved in the war, and (2) that the years of civil war have taken their toll on the country's economic infrastructure. We acknowledge that the general security situation for the civilian population of Liberia remains uncertain, even following the July 1997 elections. On the record before us, however, these changes do not materially affect the basis of the applicant's asylum claim. At the time of the exclusion hearing, the applicant claimed that the fighting was already worse and that the different sides were continuing to splinter. None of the new evidence submitted by the applicant shows that he is likely to suffer harm in a form different from the general population in Liberia, or that he will suffer harm at the hands of the NPFL based on his political opinion rather than because he deserted its forces. *Matter of Sanchez and Escobar*, 19 I&N Dec. 276 (BIA 1985), *aff'd*, 801 F.2d 1571 (9th Cir. 1986) (stating that the harm resulting from country-wide civil strife and anarchy is not persecution on account of one of the five enumerated grounds); *see also Perlera-Escobar v. INS*, 894 F.2d 1292 (11th Cir. 1990); *Rodriguez-Rivera v. INS*, 848 F.2d 998 (9th Cir. 1988).

Neither does the Attorney General's decision to redesignate Liberia in the TPS program represent a change in circumstances material to the applicant's asylum claim, as there is no further evidence that the applicant himself is at greater risk based on his race, religion, nationality, social group, or political opinion than the rest of the population. In redesignating Liberia in the TPS program, the Attorney General recognized that the continuation of civil strife in Liberia through 1996 prevented Liberian citizens and residents from safely returning there. However, the expanded availability of TPS to Liberians who did not originally qualify in 1991 does not represent materially changed circumstances arising in Liberia, as the redesignation is based on the same terrible war raging there since 1989.

With respect to the applicant's arguments that the new evidence demonstrates (1) that he will suffer persecution because he is opposed to the violence in Liberia, and (2) that he will be forcibly enlisted to fight or commit violence against civilian populations, which would go against his political opinion of wishing to remain neutral, we find that the applicant is restating his asylum claim made to the Board in 1995. The applicant argued in his 1995 appeal to the Board that he was coerced into joining a guerrilla group, that he protested to his recruiters that he did not want to get involved in the fighting, and that his conscription into this group, which resulted in almost 2 years of training and fighting, constituted persecution on account of his political opinion. We view the new evidence presented by the applicant as cumulative to

his original asylum claim, and we have no new evidence concerning the effect of the elections in Liberia on the applicant's asylum claim. As we find that the applicant has not presented evidence of materially changed circumstances that would affect his asylum claim, we conclude that his motion to reopen does not fall within the time limit exception of 8 C.F.R. § 3.2(c)(3)(ii).

## VI. PRO SE DETAINED ALIENS

The dissenting opinion proposes that we ought to consider this motion as timely filed because the applicant is pro se and detained and therefore lacks control over the mailing process in his prison. In the dissent's view, we should adopt the rationale in *Houston v. Lack*, 487 U.S. 266 (1988), where the Supreme Court held that a pro se prisoner's notice of appeal from a habeas corpus denial is deemed "filed," pursuant to Federal Rule of Appellate Procedure 4(a)(1), at the moment of delivery to prison authorities for forwarding to the district court. *See also Arango-Aradondo v. INS*, 13 F.3d 610 (2d Cir. 1994).

We decline to adopt such a standard for several reasons. First, we find that the federal rules regarding timely filing are distinguishable from our own. In *Houston v. Lack, supra*, the Court noted that Rule 4(a)(1) did not define the moment at which the filing of an appeal occurred, and the lack of definition opened the interpretation of "filing" a notice of appeal to mean something other than "receipt" by the court. Also, in *Arango-Aradondo v. INS, supra*, the court found that Rule 25(a)(C) of the Federal Rules of Appellate Procedure, which applied to the alien's petition for review in the circuit court, actually provided that an appeal filed by an inmate is timely filed if deposited in the institution's internal mail system on or before the last day for filing. Likewise, as noted in *Koch v. Ricketts*, 68 F.3d 1191 (9th Cir. 1995), Federal Rule of Appellate Procedure 4(c) specifically provided for constructive filing of a notice of appeal, that is, a notice of appeal was timely filed if deposited in the institution's internal mail system on or before the last day for filing. *See also Cooper v. Brookshire*, 70 F.3d 377 (5th Cir. 1995).

In contrast, the appeals and motions regulations for the Board explicitly define the moment of filing of a notice of appeal as the moment the appeal is *received* at the Board. 8 C.F.R. § 3.38 (1997). When a procedural rule is clear, such as it is here, the courts have declined to follow the policy arguments in *Houston v. Lack, supra*. For example, in *Guirguis v. INS*, 993 F.2d 508 (5th Cir. 1993), the court of appeals found untimely a petition for review that was received 1 day late. The court first noted that unlike in *Houston v. Lack, supra*, there was no reliable record concerning the handling of mail in Service detention facilities, and thus no evidence of the ability of immigration detainees to place matters directly into the regular United States mail rather than having to entrust them to Service officials. Further, the court found that appellate review of a final administrative order of deportation is

governed by Federal Rules of Appellate Procedure 15(a) and 25(a) rather than the rules applicable to appeals from district courts at issue in *Houston*. These rules, which govern review of an order of an administrative agency, board, commission, or officer, specify that timely filing is achieved when submissions are received by the clerk of the court within the time fixed for filing. *See also White v. INS*, 6 F.3d 1312 (8th Cir. 1993), *cert. denied*, 511 U.S. 1141 (1994) (one of the last cases before Rule 25(a) was amended to incorporate *Houston v. Lack*).

In *Nigro v. Sullivan*, 40 F.3d 990 (9th Cir. 1994), the United States Court of Appeals for the Ninth Circuit noted that the regulations governing appellate review in the Bureau of Prisons, 28 C.F.R. § 542.14 (1993), define an appeal as filed when it is received at the General Counsel's Office and a receipt for it is issued. As reasoned by the court in *Nigro*, "received" is a term that is not open to other interpretations of "filing" and does not constructively mean "deposited in the institution's internal mail system." *See id.* at 994; Fed. R. App. P. 25(a)(C). The court found that defendant Nigro's appeal was not timely filed with the General Counsel's Office and dismissed a habeas writ, finding that the defendant failed to exhaust his administrative remedies. The court further distinguished *Houston v. Lack, supra*, noting that *Houston* involved access to the courts and not access to administrative procedures. *Nigro v. Sullivan, supra*, at 995.

We further note that *Houston v. Lack, supra*, and the caselaw spawned from it refer to appeals and not specifically to motions. Likewise, the Federal Rules of Appellate Procedure, and the other procedural rules discussed in these cases that define timely filing, refer specifically to appeals. Indeed, our own rule regarding the timeliness of filing, 8 C.F.R. § 3.38, refers to notices of appeal. No definition of timely filing was ever adjudicated in the context of motions to reopen or reconsider before the Board because, until the new appeals and motions regulations were promulgated, there was no filing deadline with regard to motions to reopen or reconsider.

The federal rules are also mostly silent with regard to the filing deadlines of motions. In the Federal Rules of Civil Procedure, motions for "relief from judgment orders," contained in Rule 60(b), most resemble our motions to reopen or reconsider. A Rule 60(b) motion is allowed "within a reasonable time," although in many instances, not more than a year after the judgment order. However, the rule makes no mention of how timely filing is accomplished. Therefore, there is no wide body of law dealing with the timely filing of a motion. The body of law we look to in this regard comes from the appellate process, where the definition of "timely filing" is often extended to other forms of filings where the rules may be silent. In our own context, we view the definition of timely filing of appeals to extend to motions to reopen or reconsider, as it would be a consistent application of the regulations to enforce one filing definition, and such a definition would also be consistent

with the general rule that *receipt* by the court clerk constitutes filing. *Houston v. Lack, supra; United States v. Lombardo*, 241 U.S. 73 (1916).

In sum, in a case such as this where the new motions and appeals regulations plainly define the term "filing," we are obliged to follow the definition, rather than ignore it based on the perceived equities or inequities of any particular case. The applicant's motion to reopen was untimely, and he is not entitled to different treatment based on his custody status.

## VII. THE BOARD'S POWER TO REOPEN ON ITS OWN MOTION

The current temporal and numerical limitations in the regulations governing motions to reopen or reconsider originate in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. By that legislation, the Attorney General was directed to issue regulations limiting the number of motions to reopen or reconsider that an alien could make and establishing a maximum time period for the filing of such motions. Congress intended by this provision to expedite the judicial review process in immigration proceedings and to discourage the filing of dilatory appeals and motions. *Stone v. INS*, 514 U.S. 386 (1995).

Notwithstanding the statutorily mandated restrictions, the Board retains limited discretionary powers under the regulations to reopen or reconsider cases on our own motion. 8 C.F.R. § 3.2(a). That power, however, allows the Board to reopen proceedings sua sponte in exceptional situations not present here. The power to reopen on our own motion is not meant to be used as a general cure for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship. When Congress passes laws, and agencies promulgate rules as directed by those laws, these acts are meant to have real and substantial effect. *Stone v. INS, supra*. That is the case with the Immigration Act of 1990, and the motions and appeals regulations promulgated pursuant to that Act in April 1996. These rules are meant to bring finality to immigration proceedings and to redress the problem of abuses resulting from the filing of successive or frivolous motions.

## VIII. CONCLUSION

In conclusion, the applicant's motion to reconsider and the second motion to reconsider filed on his behalf by counsel are both untimely as they were received more than 60 days late. There is no exception to the time bar imposed on motions to reconsider. The motion to reopen is also untimely as it was received 2 days late. To be timely filed, a submission has to be received at the Board within the time allowed by regulation. The motion to reopen does not fall within the exception for reopening out of time to apply for asylum based on changed circumstances arising in the country of nationality since the time of the Immigration Judge's decision. Finally, the applicant has

not demonstrated any exceptional situation which would warrant reopening on the Board's own motion. Accordingly, the motions will be denied.

**ORDER:**     The motion to reconsider is denied as untimely.

**FURTHER ORDER:**     The motion to reopen is denied as untimely.

*CONCURRING OPINION:* Gustavo D. Villageliu, Board Member

I respectfully concur.

While I agree with the majority's opinion I merely wish to comment on the discussion regarding the Board's power to reopen on its own motion in exceptional situations. Such situations, in my opinion, must include cases where the courts have reversed the underlying basis for the Board's legal conclusions in a case after the 30-day limitation for motions to reconsider has expired. To decline to reconsider an improperly decided case would be a waste of limited judicial and administrative resources and inconsistent with the goals expressed by Congress to provide exceptions in the interests of justice. *See* H.R. Conf. Rep. No. 101-955, at 133 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6784, 6798; *cf.* 8 C.F.R. § 3.1(d)(1) (1997) (delegating to the Board the Attorney General's discretionary authority, subject to specific limitations in the regulations).

*DISSENTING OPINION:* Lory D. Rosenberg, Board Member

I respectfully dissent.

The applicant, a native and citizen of Liberia, is an applicant for asylum under section 208 of the Immigration and Nationality Act, 8 U.S.C. § 1158 (1994), and withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994). He has neither been charged with nor convicted of any crime, but he is detained, and has been in the custody of the Immigration and Natualization Service (Service), held in a jail meant for persons convicted of criminal offenses, for nearly 3 years. He has been physically located either at the Service's then-Esmor detention facility in Elizabeth, New Jersey, or at the Lehigh County jail, a county prison facility in Allenwood, Pennsylvania, with which the Service has contracted to hold detained asylum seekers and other noncitizens. His imprisonment came about because he was taken into custody at John F. Kennedy Airport when he presented the passport he had used during his flight and asked for asylum.

We can reopen and reconsider the likelihood of persecution faced by the applicant in Liberia, as he asks, under a fair and reasonable interpretation of any of three permissible regulatory avenues. We should have invoked at least one of these paths in order to afford this detained alien an opportunity to perfect his claim under present circumstances before returning him to Liberia.

First, his motion can be treated as timely filed and received under 8 C.F.R. §§ 3.2(b) and (c)(1997) as of the date it was received by the prison mail

system, an interpretation consistent with the law of the Supreme Court and of the United States Court of Appeals for the Third Circuit, in which this case arises. Second, if we are unwilling to recognize receipt of his motion by prison officials as constituting receipt for our jurisdictional purposes, we can assert jurisdiction over his motion without regard to temporal or numerical limitations under 8 C.F.R. § 3.2(c)(3)(ii) on account of changed circumstances in Liberia. Third, if we are unwilling to follow Supreme Court and circuit authority, or to recognize the fact of changed circumstances in terms of country conditions since the applicant's hearing and review before this Board, it nonetheless would be prudent to reopen the case and reconsider our disposition of the applicant's appeal in light of our authority under 8 C.F.R. § 3.2(a).

The majority, however, opts for none of these alternatives.[1] I cannot travel down such a dangerous road with them, nor can I join them on the route they take to reach such a destination. Consequently, I dissent.

## I. DENIAL OF THE APPLICANT'S MOTION IS THE RESULT OF AN UNREASONABLY RESTRICTIVE READING OF THE REGULATIONS, AND AN UNJUSTIFIABLE DEPARTURE FROM APPLICABLE LAW

The applicant's motion to reopen and reconsider (providing new evidence that previously had been unavailable, some of which is proffered to establish changed circumstances in Liberia), and an accompanying brief citing legal authority, apparently written in his own hand, was prepared and signed by him on September 25, 1996, in the Lehigh detention facility to which he had been transferred. It was submitted for delivery to the prison mail system, together with a certificate of service, signed by the applicant under penalty of perjury, on that same date.

It arrived and was "stamped in" at the Board, however, on October 2, 1996. The Service has opposed the motion to reopen on the basis that the documents submitted in support of changed circumstances are not material because they consist of reports from Amnesty International and news clippings, and even if material, are of little effect, given the basis for the Board's dismissal of the applicant's appeal.[2]

The crux of the matter before us has to do with asylum protection and consideration of substantive issues involving the applicant's liberty and his

---

[1] A stay of exclusion and deportation was granted on January 23, 1997, in connection with the applicant's motion to reopen and reconsider, with one of three panel members dissenting. My concurrence to our grant of the applicant's request for a stay stated that I would allow consideration of his motion and any further proceedings appropriate under that motion.

[2] Cf. 8 C.F.R. § 208.12(a)(1997); *see also Fengchu Chang v. INS*, 119 F.3d 1055 (3d Cir. 1997) (giving weight to reports of conditions from groups other than the State Department, such as "Human Rights Watch/Asia Report," and discussion concerning the Board's prior dismissal of the applicant's appeal, *infra*).

treatment by our immigration system, ultimately having the potential for life or death consequences. The majority seeks to resolve the matter on purely technical grounds, mechanically disposing of the applicant's concerns without ever coming close to touching the heart of the applicant's claim for protection, or the issue of how we should deal with the unfortunate fact that asylum seekers continue to be detained under the provisions of our immigration system.[3]

Procedural requirements should not bar this claim. Considerations of equity and fairness, as well as the principle of lenity toward asylum seekers under domestic and international law, warrant our reopening of the applicant's case to allow adjudication of the proffered evidence of deteriorating country conditions, as well as to provide a reasoned decision under controlling law on the merits of his claim.

## A. The Applicant Filed a Timely Motion to Reopen and Reconsider

At the outset, I note that the regulations, as promulgated, do not specifically provide that a *motion* to reopen or reconsider must have been *received* within the designated time period provided under the Attorney General's regulations, effective July 1, 1996. By comparison, the regulations governing appeals state specifically and clearly that an appeal must have been *received* by the time afforded for appeal. *See* 8 C.F.R. § 3.2. Effective July 1, 1996, a party is allowed one motion to reopen which must be filed within 90 days of the issuance of a final administrative order or on or before September 30, 1996, whichever is later. *See* 8 C.F.R. § 3.2(c)(2). A party is allowed one motion to reconsider which must be filed within 30 days of the order in which reconsideration is sought, or on or before July 31, 1996, whichever is later. *See* 8 C.F.R. § 3.2(b)(2).

In its opinion, the majority makes much of this technical distinction in the regulations, arguing that despite the presence of the specific articulation of such a construction in the appeals provision, and the absence of such language in the motions provisions, the same standard as applies to the timely filing of appeals should apply to the filing of motions to reopen and reconsider. That, however, is a straw man which need not be set up only to be knocked down. Without conceding that such a distinction may be one without a difference in every case, I do not find it to be a factor on which the applicant's motion turns in *this* case. For purposes of my dissent, therefore, I will

---

[3] *See also* related concerns expressed by the Presidentially appointed Commission on Immigration Reform in "U.S. Refugee Policy: Taking Leadership: Report to Congress," at 29-30 (June 1997)(finding detention of asylum seekers not a good use of scarce resources and objecting to a new threshold standard to be met by certain asylum applicants to determine who will gain access to an asylum hearing); Memorandum from former Commissioner Gene McNary (April 1992) (creating the Asylum Pre-Screening Officer ("APSO") program, which facilitates asylum seekers' release from detention, to comport, in part, with international norms).

proceed as though actual *receipt*, as opposed to mailing, is the touchstone for determining whether or not both an appeal or a motion is timely *filed*.

The majority completely misreads the law that appropriately governs the proceedings in this case. Ordinarily, according to the interpretation I have conceded for purposes of this decision, a motion under 8 C.F.R. § 3.2(c)(2) would be out of time if not *received* at the Board by the designated date, which in this case would be September 30, 1996.

As a detainee, incarcerated in a county jail, the applicant had little control over the outgoing mail or when his motion papers would be sent out. Case law and federal rules uniformly support treating the applicant's motion as *received* at the time it was submitted for mailing to the prison authorities or deposited in the prison mail system. *See Houston v. Lack*, 487 U.S. 266 (1988) (holding that a prisoner's notice of appeal is deemed *filed* at the moment it is conveyed to the prison authorities for forwarding to the district court); *Arango-Abadondo v. INS*, 13 F.3d 610, 612 (2d Cir. 1994) (finding no jurisdictional bar where a detainee verified that he had deposited a petition for review of a final deportation order in prison internal mail system on the 90th and final day allowed for *filing* of such petitions); *see also* Fed. R. App. P. 25(a)(2)(C) (establishing that papers filed by an inmate confined in an institution are timely *filed* if deposited in the institution's internal mail system, as established by a notarized statement or declaration in compliance with 28 U.S.C. § 1746).

The Supreme Court's decision in *Fallen v. United States,* 378 U.S. 139 (1964), on which the decision in *Houston v. Lack, supra*, was predicated, provides further support for finding that delivery of a timely pleading to prison authorities or a prison mail system constitutes timely *receipt* of the decision notwithstanding whether the actual delivery and receipt of the notice in question to the clerk of court occurs after the filing deadline.[4] In *Fallen*, a case involving both a motion for a new trial *and* an appeal, the court held that when the incarcerated litigant must depend on prison authorities for mailing his motion to a clerk of court, evidence that the prisoner had delivered his notice to prison authorities for mailing to the clerk of court within the appeal period constitutes timely *receipt* of the documents, despite the fact that the clerk's office did not receive the notice until after the appeal period expired. *Fallen v. United States, supra*, at 142. The Supreme Court there emphasized that the "Rules *are not, and were not intended to be, a rigid code to have an inflexible meaning irrespective of the circumstances." Id.* (emphasis added).

---

[4] In *Fallen v. United States, supra*, the motion and notice were received by the clerk on January 29, a date outside the period allowed for such filing, but were dated by the petitioner on January 23. The envelope containing the letters bore a government frank but no postmark. Similarly, the applicant's motion, brief, and certificate of service were received by the Board's Appeals Processing Unit on October 2, but dated by the applicant on September 25. The envelope in which they were received bears a government frank but no postmark.

This reading of the law and procedural requirements pertaining to the cases of detained prisoners does *not* rely on our invoking a rule that *mailing* constitutes a tmely *filing*. The overwhelming authority instead supports the view for which the majority advocates: that it is the *receipt* of the document with the clerk of court that perfects *filing*.

What the majority fails to understand is that under these cases, in the case of a detained alien, "receipt" is accomplished when the prisoner delivers the material to be filed to the jailer. In other words, the jailer stands in the shoes of the court or agency clerk by whom the documents must be received in order for filing to be properly accomplished by the designated deadline. *See Fallen v. United States, supra*, at 144 (Stewart, Clark, Harlan and Brennan, J., concurring) (opining that "the jailer is in effect the clerk of the District Court").

If the decisions of the Supreme Court are not enough to provide persuasive legal support for this interpretation, the decisions of the United States Court of Appeals for the Third Circuit, in which the instant case arises, underscore the point.[5] In *United States v. Grana*, 864 F.2d 312 (3d Cir. 1989), the court found that in computing the timeliness of filings which are jurisdictional in nature, any delay beyond the incarcerated litigant's control, attributable to prison officials, is to be excluded from the computation of time allowed the prisoner for appeal.

Although technically out of time, the court found that under *Houston v. Lack, supra*, and *Fallen v. United States, supra*, when the incarcerated litigant must depend on prison authorities for delivery of a judgement or for mailing to a clerk of court, he has lost control over his ability to comply with filing requirements. *United States v. Grana, supra*, at 314-15. The Third Circuit also has emphasized that in seeking to accommodate both strict jurisdictional time limitations and fairness to imprisoned pro se litigants, where the impediment to timely filing arises from the process of transmitting mail from the prison over which the prisoner has no control, the requirements of procedural rules should be liberally construed and "" mere technicalities" should not stand in the way of consideration of a case on its merits.'" *United States v. Grana, supra,* at 315 (quoting *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 316 (1988) (quoting *Foman v. Davis*, 371 U.S. 178, 181 (1962)), and citing *United States v. Solly*, 545 F.2d 874 (3d Cir. 1976)(holding that a clerk's receipt of a notice of appeal meets the "filing" requirement even if the notice was not formally noted as "filed")); *see also Smith v. Evans*, 853 F.2d 155, 161-62 (3d Cir. 1988) (finding application of the *Houston* rule warranted).

The Third Circuit has unequivocally found that a technically untimely filing due to prison delay which is beyond the prisoner's control cannot be used

---

[5] The Board is bound to follow the law of the United States Court of Appeals for the Third Circuit, in which this case arises. *See Matter of K-S-*, 20 I&N Dec. 715, 719-20 (BIA 1993); *Matter of Anselmo*, 20 I&N Dec. 25, 31-32 (BIA 1989).

for determining non-compliance with the required filing time. Similarly, the circuit court has held that evidence that the prisoner had delivered his notice to prison authorities for mailing to the clerk of court within the appeal period is sufficient to establish a timely *filing*. The applicability of these principles are not limited to appeals or motions arising in the criminal justice system.

In *In re Flanagan*, 999 F.2d 753 (3d Cir. 1993), the Third Circuit found that the rationale of *Houston v. Lack, supra,* controlled prisoners' notices of appeal to a district court from a decision issued by a bankruptcy court. The court found that the prisoners' notices of appeal were timely when deposited with prison officials, addressed to the clerk with postage prepaid, on the last day for filing. The court so held even though the notices were not actually received and stamped filed by the clerk until 8 days after the closing date of the appeal period. The court specifically addressed the Government's argument that slow mail should not justify the application of the *Houston* principle and that evidence of actual prison delay must be demonstrated, finding that the Supreme Court created "'a bright-line rule, not an uncertain one.'" *Id*. at 757 (quoting *Houston v. Lack, supra*, at 276). Instead, the court reasoned that "[c]ertain statements in *Houston*, along with its reliance on the concurrence in *Fallen*, indicate a broader rule—*one that seems to make the prison mail room an adjunct of the clerk's office without regard to whether there has been an allegation of actual delay." In re Flanagan, supra,* at 759 (emphasis added).

The majority is simply wrong in reading either *Houston v. Lack, supra*, or my argument that *Houston* should extend to this case, as asserting the proposition that it is necessary to adopt some definition of "filing" other than *receipt* by the clerk. Their citation of authority from other circuit courts of appeals is inapposite, as such authority is directly contrary to the rulings of the Third Circuit in which this case arises and by which it is governed.[6]

Moreover, I contend that the better reading of this procedural rule as applied to asylum applicants facing refoulement to a country in which persecution is claimed, and to other applicants facing deportation from the United States, is the more liberal reading adopted by the Third Circuit.[7] It is

---

[6] I note, furthermore, that it is *Gurguis v. INS*, 993 F.2d 508 (5th Cir. 1993), cited by the majority, and not *Houston v. Lack, supra*, which is inapplicable to this case. The Fifth Circuit attempted to distinguish *Houston* because it addressed appeals to district courts, rather than to circuit courts, whose procedural rules require actual receipt to perfect a filing under Rule 15(a) of the Federal Rules of Appellate Procedure. *See also Nigro v. Sullivan*, 40 F.3d 990 (9th Cir. 1994)(attempting to construe "file" and "serve" so as to differentiate them from the status of a notice being "received"). As I have shown, however, *Houston* and *Fallen* and their progeny in the Third Circuit expressly treat *deposit* of pleadings to be mailed with prison officials as *receipt* by the clerk of court, be it a district court, a circuit court, or an administrative agency.

[7] The majority's reliance on the *absence* of specific procedures for handling of mail in detention facilities run by the Service, as noted by the Fifth Circuit in *Gurguis v. INS, supra*, serves neither reason nor fairness. First, a good percentage of detainees held by the Service are not held in Service-run detention facilities, but are housed in actual county jails and federal

consistent with notions of due process which have long been affirmed by the courts in recognition of the fact that expulsion carries extremely harsh consequences and that deportation is often the equivalent of banishment or exile. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *Barber v. Gonzales*, 347 U.S. 637, 642 (1954); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948); *Bridges v. Wixon*, 326 U.S. 135, 154 (1945) (stating that deportation "visits a great hardship on the individual . . . . Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness."); *see also Romero-Morales v. INS*, 25 F.3d 125, 131 (2d Cir. 1994) (finding "disquieting" the Immigration Judge's "failure to examine the particulars of the case before him"); *Baires v. INS*, 856 F.2d 89, 91 (9th Cir. 1988) (holding that administrative expediency must give way to protection of fundamental rights).

The Service imprisoned an asylum seeker, not a criminal. Now, we are not even allowing that asylum seeker the benefit of a legal construction developed to protect access to the courts in such cases. It is inappropriate and contrary to superior authority to refuse to reopen the applicant's case under 8 C.F.R. § 3.2(c)(1). As the Supreme Court noted with disapproval in *Fallen*, the fact that regulations "were not approached with sympathy . . . is apparent when the circumstances of this case are examined." *Fallen v. United States, supra*, at 142. Consequently, I would treat this motion as filed and received "in time," and reopen and reconsider the applicant's asylum claim.

## B.  The Applicant's Motion Adequately Asserts Changed Circumstances Affecting His Asylum Claim

Where a movant seeks reopening or reconsideration by a motion that is considered to be untimely or in excess of the single motion allowed by the regulations, he must show changed circumstances.[8] 8 C.F.R. § 3.2(c)(3)(ii). To insure our compliance with the United States' international refugee obligations embodied in statutory provisions and judicial decisions interpreting such law, the standard for determining changed circumstances must be a flexible one. Most recently, it has been defined as encompassing "circumstances materially affecting the applicant's eligibility for asylum" including, but not

---

prisons meant for criminal inmates. Second, the absence of any official process for handling mail by the Service, whose officers double as jailers and party litigants for the "prosecution" of exclusion and deportation charges, only underscores the need for a liberal reading which deems deposit with detention authorities to be receipt by an adjunct of the Appeals Processing Unit clerk. Third, the absence of agency procedures to insure that appeal and motion papers filed by incarcerated litigants are timely conveyed to and received by the agency needs to be remedied, not relied upon to defeat otherwise legitimate and nonfrivolous actions.

[8] "Change(d)" is defined as "1 a) to become different; alter[ed]; var[ied]. . . b) to undergo alteration or replacement . . . 2 to pass from one phase to another." Something that is "changed" is defined as "something that is or may be substituted; something of the same kind, but new and fresh." Webster's New World Dictionary 234 (Third College Edition 1988).

limited to, "(A) Changes in conditions in the applicant's country of national-
ity . . . or (B) Changes in objective circumstances in the United States, includ-
ing changes in applicable U.S. law, that create a reasonable possibility" that
an applicant is eligible for asylum. 62 Fed. Reg. 10,312, 10,339 (1997) (to be
codified at 8 C.F.R. 208.4(a)(4)(i)); *see also* sections 208(a)(2)(C), (D) of the
Act, 8 U.S.C.A. §§ 1158(a)(2)(C),(D)(West Supp. 1997).[9]

The majority cites no authority for its implicit contention that the concept
of changed circumstances requires a new basis for an asylum claim. Such is
directly inapposite to the holdings in other cases joined by many members of
the instant majority. *See, e.g., Matter of C-A-L-*, 21 I&N Dec. 754, 757 (BIA
1997) (finding the guerrilla presence in Guatemala to have declined, so that
"the threat to the general population has decreased"); *see also Matter of
T-M-B-,* 21 I&N Dec. 775, 777 (BIA 1997) (finding that the State Depart-
ment profile indicates that the agent of persecution has decreased in number
of adherents and has lost some degree of ability to operate throughout the
country). And, I would like to know what authority supersedes that of the
*Handbook* which recognizes that the *cumulative*[10] effect of several incidents
ascertained in light of a wide range of *circumstances* may constitute a basis
for a finding of a well-founded fear of persecution. Office of the United
Nations High Commissioner for Refugees, *Handbook on Procedures and
Criteria for Determining Refugee Status Under the 1951 Convention and the
1967 Protocol Relating to the Status of Refugees* para. 201, at 48 (Geneva
1992)("*Handbook*"); *see also id.* para. 53, at 14-15; *Masieh v. INS*, 73 F.3d
579 (5th Cir. 1996); *Shirazi-Pirza v. INS*, 14 F.3d 1424 (9th Cir. 1994).

On April 7, 1997, the Attorney General of the United States found that
conditions have so deteriorated in Liberia that it was necessary and appropri-
ate to redesignate Liberia within the Temporary Protected Status ("TPS")
program which affords protection from refoulement to nationals of countries
so designated. Not only did the Attorney General extend the period of protec-
tion under TPS for those Liberians already granted such status, she desig-
nated Liberia anew, with the result that Liberians within the United States

---

[9] Although these provisions appear in the Illegal Immigration Reform and Immigrant
Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546
("IIRIRA"), and implementing regulations, we have recognized that reference to such
provisions is an appropriate indicator of congressional intent in adjudicating cases governed by
prior statutory enactments. *See Matter of Q-T-M- T-*, 21 I&N Dec. 639 (BIA 1996).

[10] "Cumulative" is defined as "1 increasing in effect, size, quantity, etc. by successive
additions . . . 2 designating additional evidence that gives support to earlier evidence."
Webster's New World Dictionary 338 (Third College Edition 1988). In the motion to reopen
context, the fact that new, previously unavailable evidence is "cumulative" in relation to
evidence previously submitted and considered, does not preclude its consideration as evidence
of "changed circumstances." 62 Fed. Reg. 10,312, 10,339 (1997) (to be codified as 8 C.F.R.
§ 204.4(a)(4)) (defining "changed circumstances" as those "materially affecting the applicant's
eligiblity for asylum").

who were not protected under the original program may now seek and be granted such protection. 62 Fed. Reg. 16,608-10 (1997).

Nevertheless, the majority persists in concluding that the applicant has not shown changed circumstances. Remarkably, the majority finds that the continued and dramatic increase in violence, war, and tribal and political persecution do not constitute "materially changed circumstances" that would affect the applicant's claim that he faces persecution on account of his desertion from coerced and involuntary participation in the Charles Taylor paramilitary forces in which he would have had to commit human rights abuses. The majority dismisses the applicant's new documentary evidence of current country conditions and the Attorney General's April 1997 designation of Liberia in the TPS program, of which we may take administrative notice at least for purposes of consideration of the applicant's motion under 8 C.F.R. § 3.2(c)(3)(ii), as no more than a restatement of his original asylum claim.

It is critical that we not dismiss such "additional evidence" or diminish its significance in relation to the requirement under 8 C.F.R. § 3.2(c)(3)(ii) that an asylum applicant establish changed circumstances. All qualitative elements of asylum eligibility aside, a well-founded fear of persecution is determined ultimately according to a numeric approximation in which we measure the likelihood that there exists at least a 10% chance that the persecution feared will occur. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 440 (1987) (recognizing that there "is simply no room in the United Nations' definition [of the term "refugee," which essentially is the same as the Immigration and Naturalization Act definition] for concluding that because an applicant only has a 10% chance of being . . . persecuted, that he or she has no 'well-founded fear' of the event happening"). Disregarding or rejecting evidence that is cumulative, because it is similar to, supports, merely alters in quantity or effect, but is not fundamentally different in nature from, previously considered evidence, is contrary to the the refugee definition as interpreted by the Supreme Court.

I believe that "changed circumstances," the additional requirement imposed before we will grant an out of time or number motion to reopen in the asylum context under the regulations, encompasses not only foreign electoral changes, or other changes in government which might extinguish or limit relief available to an asylum seeker, but both qualitative and quantitative changes which may enhance the likelihood of persecution and require us to extend relief. Moreover, I find that affirmative and material evidence submitted with the applicant's motion and responsive pleadings establishes a prima facie showing of changed circumstances sufficient to warrant reopening of the applicant's case for a hearing.[11]

---

[11] It is important to note that in determining whether an applicant has satisfied the terms of 8 C.F.R. § 3.2(c)(3)(ii), we are assessing the proferred evidence under a "prima facie" standard, in which the proferred evidence is to be taken as being true factually, and the question before us

Despite a supposed peace accord in August 1995, the Department of State report indicates that the warring factions continued to be as active or more active than previously, engaging in arbitrary detentions of "prisoners of war," and the deliberately targeted murder, mutilation, forced rape, torture, and abductions of each other and the civilian population, that those working to implement the accord have been attacked by the warring factions, and that there are no operating courts in most areas of the country. Committees on International Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* 141-44 (Joint Comm. Print 1996). This has been more than confirmed by the Attorney General's recent assessment, resulting in her extending *and* redesignating Liberia as a country whose qualifying nationals are to be accorded TPS. Such evidence of continued and unabating violence, including tribal and factional persecution, is a "changed circumstance" and *increases* the likelihood that the applicant is likely to face repercussions if forcibly returned to Liberia.

Furthermore, it is fair to say that the majority has taken administrative notice of recent electoral events in which Charles Taylor has become President. This should require consideration of how the applicant's alleged persecutor being elected President affects the risk of persecution to him personally. The cloaking of Charles Taylor and his forces with state power would appear to have enhanced and not diminished the likelihood of the applicant's fear of persecution. If anything, the recent July election of Charles Taylor underscores the necessity for a reexamination of the applicant's claim in light of all the pertinent facts. At a minimum, in light of the legally erroneous adjudication of the applicant's original appeal by this Board, discussed below, the prima facie evidence submitted and additional changes of which the majority now takes administrative notice warrant reopening.

## C. Board Consideration of the Applicant's Motion by Certification is Warranted to Correct Errors of Law and Comport with International Refugee Protections

If the majority is determined not to recognize the applicant's motion as timely filed and refuses to acknowledge that evidence of changed conditions in Liberia warrant reopening, we should, at the very least, exercise our certification authority under 8 C.F.R. § 3.2(a) to hear the applicant's motion on its merits. An out of time motion may be considered by the Board, as we are free to reopen or reconsider any case in which we have rendered a decision. 8 C.F.R. § 3.2(a); *see also* 8 C.F.R. § 3.1(d)(1) (1997) (authorizing the Board

---

is whether such evidence, together with that already in the record, could satisfy the applicant's burden of demonstrating a well-founded fear of persecution. *Matter of L-O-G-*, 21 I&N Dec. 413 (BIA 1996); *Matter of Coehlo*, 20 I&N Dec. 464 (BIA 1992).

to exercise the discretion and authority conferred on it by the Attorney General as is appropriate and necessary for the disposition of the case).

The Third Circuit favors a meaningful hearing in asylum cases. *Marincas v. INS*, 92 F.3d 195 (3d Cir. 1996). In addition, I believe our decision below is erroneous as a matter of law. *See Fengchu Chang v. INS*, 119 F.3d 1055 (3d Cir. 1997) (finding the Board to have erred in mischaracterizing what constitutes a political opinion held by the victim of persecution, as well as what constitutes politically motivated action on the part of the persecutor). Such an error, alone, without a showing of changed circumstances, constitutes the type of situation in which our authority to reopen under certification should be exercised.

The Immigration Judge found the applicant to be credible and recognized that the applicant held a political view which he had expressed when he said the guerrilla war between different factions in Liberia was "unfair and unjustified." Contrary to our finding in support of denying the respondent's prior appeal—that the applicant did not desert the Charles Taylor forces due to his desire not to participate in human rights violations or other acts condemned by the international community—the applicant stated, as part of his explanation for resisting recruitment and opposing the war, that many innocent people were suspected of being collaborators, giving out information about the guerrillas, and were therefore murdered by Charles Taylors' forces. Similarly, as another part of an explanation for why he found the war unfair and did not want to participate in it, he testified that once he was recruited forcibly by the Charles Taylor National Patriotic Liberation Front ("NPFL"), he was forced to fight against and try to kill his compatriots.

The applicant testified that he accompanied the recruiters only on pain of death. He testified further from personal observation that he witnessed a group who refused to go with the NPLF killed, and that he saw a group of friends who tried to escape killed. These circumstances have only been exacerbated by recent developments in Liberia.

We have held that punishment for refusing to serve in the military in Afghanistan, under circumstances in which young men were dragooned and impressed into service in the place of those who refused to fight against their compatriots, differs from mere refusal to avoid military service and *would* constitute persecution on account of political opinion. *Matter of Salim*, 18 I&N Dec. 311 (BIA 1982). Furthermore, in *M.A. v. United States INS*, 858 F.2d 210 (4th Cir. 1988), the court reasoned that draft evasion can be an expression of political opposition. The factors of refusal to commit violence against fellow countrymen and the type of punishment inflicted for desertion are relevant in determining asylum eligibility, and the Board must take into consideration the genuineness of the applicant's opposition and the type of treatment he fears upon return. *Id*. at 216; *see also Fengchu Chang v. INS, supra*, at 8-9, 11.

The Board also has held that where conscription places an individual in a position in which he might be forced to commit acts that the international community condemns, or where refusal to serve could lead to disproportionate punishment motivated by the evader's actual or perceived political opinion, such claims come within the statutory grounds and warrant protection under the Act. *Matter of A-G-*, 19 I&N Dec. 502, 506 (BIA 1987), *aff'd sub nom. M.A. v. United States INS*, 899 F.2d 304 (4th Cir. 1990). There is no requirement, which I find implicit in our opinion, that a deserter who disagrees with his government regarding political justification for military action must desert precisely at the moment that the military entity requires him to commit an atrocity. It is enough that the military forces are known to commit atrocities and that the applicant deplores and does not wish to commit them. *M.A. v. United States INS, supra*, at 315; *Matter of A-G-, supra*.

Contrary to our conclusion on appeal that the applicant "never expressed any" political opinion, he told the recruiters that he did not want to join them and didn't agree with what they were doing, and stated he wanted to live peacefully. *Cf. INS v. Elias-Zacarias*, 502 U.S. 478 (1992); *Fengchu Chang v. INS, supra*, at 7 (ruling that to "characterize this action . . . as anything other than political narrows the term 'political' beyond recognition"). While statements in opposition to the "unfair war" and the "killing of his compatriots" may not express a sophisticated political analysis, it is certainly unreasonable to say that opposition to a war and to the killing of one's own countrymen is not a political view. *Fengchu Chang v. INS, supra*, at 7 (citing *Osorio v. INS*, 18 F.3d 1017, 1029 (2d Cir. 1994)).[12] Finally, since the applicant's claim was heard before the Immigration Judge and considered by the Board on appeal in 1995, we have clarified that the proper standard to be applied to an applicant's claim is whether he has proven he has a belief or characteristic offensive to the agent of persecution, and the alleged persecutor has the inclination and ability to harm him, *at least in part*, on account of that belief or characteristic. *Matter of S-P-*, 21 I&N Dec. 486 (BIA 1996); *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996).[13]

---

[12] The decision of the Board appears to be factually in error when it states that the law of the Second Circuit is controlling. This hearing took place in the Immigration Court at Elizabeth, New Jersey, which is within the jurisdiction of the United States Court of Appeals for the Third Circuit. Moreover, even assuming that Second Circuit law is controlling, which it is not, the Board misconstrues the court's decision in *Sotelo-Aquije v. Slattery*, 17 F.3d 33, 36 (2d Cir. 1994), to require public expression of an opinion it does not so require. And even if it did, the applicant *did* express his opposition directly to the Charles Taylor forces when they came for him. *See also Fengchu Chang v. INS, supra*, (citing numerous decisions of the United States Courts of Appeals for the Ninth and Second Circuits in support of its reasoning and conclusion).

[13] *Canas-Segovia v. INS*, 970 F.2d 599, 602 (9th Cir. 1992) (holding on remand that while the persecutor's motive was important, the victim of persecution does not bear the unreasonable burden of having to determine the exact motivation of the persecutor or that political or other

In *Fengchu Chang v. INS, supra*, the Third Circuit came to the same conclusion, and it is that interpretation we must follow. Under the law in effect today, an applicant's request for asylum should be sustained if he establishes that, in part, the persecutor's motive was to overcome a belief or characteristic related to one of the five grounds. *Matter of S-P-, supra.*

The restrictive interpretation applied by the majority to the applicant's motion is unwarranted under the facts and circumstances before us. While the regulations may strive in part to eliminate "successive . . . appeals and motions," *Stone v. INS*, 514 U.S. 386, 115 S. Ct. 1537, 1546 (1995), this is not a case where the applicant has qualified for a new form of relief by virtue of delaying his deportation. He has been in Service detention throughout and the Service apparently has not chosen to deport him until a significant period of time has passed. During that period not only have conditions changed in Liberia, but infirmities in the final administrative order have been brought to our attention. Neither the regulations nor the Supreme Court's interpretation of a legitimate desire on the part of Congress to remove excludable and deportable aliens in a timely fashion preclude our reopening and reconsidering a decision in the case of a credible asylum seeker under the circumstances presented here.

I cannot conclude that the applicant has received a reasoned decision on appeal to the Board when that decision is founded on factual errors and questionable conclusions of law. I believe that a reopened hearing is likely to lead to a different result. *Matter of Coehlo, supra.* Even apart from finding the applicant's evidence of changed circumstances to be ample, I would reopen this case to properly consider, and, if necessary, supplement or clarify the record, and to render a reasoned decision based on applicable law.

## II.  CONCLUSION: THE MOTION SHOULD BE GRANTED

The applicant is due reopening of his case pursuant to his Motion to Reconsider/Reopen to the Board of Immigration Appeals, which he signed and delivered to or placed in the Lehigh County jail mail system on September 25, 1996. The applicant also is due reopening of his case on its merits given changed circumstances in Liberia and the errors in our denial of his appeal. Although the agents of persecution and the type of persecution feared by the applicant may not have changed in character, the circumstances on which the applicant's fear of persecution is based have changed materially both in scope and degree. Denial of reopening and reconsideration in the face of such acknowledgment is inconsistent with the regulations and with our international refugee obligations. The motion was timely filed and received under applicable law and notions of fairness.

---

offending positions or views attributed to the victim could motivate persecution); *see also Singh v. Ilchert*, 63 F.3d 1501 (9th Cir. 1995); *Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988).