

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-7-2003

# Woldiger v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 02-3877

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Woldiger v. Atty Gen USA" (2003). *2003 Decisions.* Paper 219.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/219

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 02-3877 and 02-4333

ABRAHAM WOLDIGER,
Petitioner

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES OF AMERICA,

Respondent

APPEAL FROM THE UNITED STATES IMMIGRATION AND
NATURALIZATION SERVICES
Agency No. A27-907-634

Argued: September 8, 2003

Before: BARRY, BECKER, and GREENBERG, <u>Circuit Judges</u>

(Opinion Filed: October 7, 2003)

James J. Orlow, Esq. (Argued)
Orlow & Orlow
6th & Chestnut Streets
656 Public Ledger Building
Philadelphia, PA 19106

Attorney for Petitioner

Ernesto H. Molina, Esq. (Argued)
David V. Bernal, Esq.
William C. Minick, Esq.
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC   20044

Attorneys for Respondent

-----

OPINION

-----

BARRY, Circuit Judge

## I. BACKGROUND

The parties are familiar with the facts of this case, and, thus, we will provide a brief summary of those facts at the outset, incorporating additional facts only as necessary to our discussion of the issues.

Petitioner Abraham Woldiger, a German citizen, has been a legal permanent resident of the United States since 1987.  His wife and seven children are all United States citizens.  On January 28, 1998, a grand jury in the Eastern District of New York returned an indictment against Woldiger, charging that he and certain of his business

associates, who owned and operated eight low-income housing projects in New York, New Jersey, Rhode Island and Pennsylvania, misappropriated payments from the U. S. Department of Housing and Urban Development (HUD) intended for the maintenance and improvement of the projects. The indictment was comprised of four counts: conspiracy to misappropriate federal funds, equity skimming, misappropriation of federal funds, and obstruction of a federal audit.

On July 5, 2000, Woldiger, pursuant to a plea agreement, pled guilty to Count Four, obstruction of a federal audit in violation of 18 U.S.C. § 1516. District Judge, now Chief Judge, Edward R. Korman entered judgment against Woldiger on the obstruction charge, dismissed the remaining three counts, and sentenced him to ten months imprisonment and three years supervised release. Relevant to the issues here, the judgment recited the "total amount of restitution" as "$1.5 million," and stated that "the Court adopts the factual findings and guideline application in the presentence report." In addition, Woldiger had earlier agreed to pay $900,000 to settle the related civil forfeiture case against him, United States v. Blackstone Realty Mgmt., No. CV-97-6455 (E.D.N.Y.).

On December 1, 2000, the Immigration and Naturalization Service (INS) initiated removal proceedings against Woldiger, charging that he was removable under 8 U.S.C. § 1227(a)(2)(A)(iii) because his conviction constituted an "aggravated felony," defined by 8 U.S.C. § 1101(a)(43)(M)(I) as an offense that "involves fraud or deceit in which the loss

to the victim or victims exceeded $10,000." On August 15, 2001, an immigration judge ("IJ") entered an order of removal, finding that Woldiger's conviction involved "fraud or deceit" because the "intent to deceive or defraud the United States" is an element of the statute under which he was convicted, 18 U.S.C. § 1516, and that the judgment itself indicated that the crime involved a loss of over $10,000 to the victim (the United States) because it required him to pay $1.5 million in restitution. The IJ noted that Judge Korman had submitted a letter stating that Woldiger had not been sentenced under the fraud guidelines and that Judge Korman did not "expect that [the conviction] would result in [Woldiger's] automatic deportation," but the IJ concluded that Woldiger had nonetheless been convicted of a crime which satisfied the statutory definition of an aggravated felony.

On May 6, 2002, the Board of Immigration Appeals (BIA) affirmed the IJ's decision, reiterating the IJ's reasoning and noting that the judgment in the criminal case expressly adopted the factual findings of the presentence report (PSR), which "indicates that the victim of the crime was the Department of Housing and Urban Development (HUD) . . . and that HUD sustained a loss of $1,800,000.00." The PSR, however, does not specify the basis for this finding of total loss amount, but does indicate that "Abraham Taub and Abraham Woldiger routinely received amounts ranging from $10,000 to $21,000 monthly," and "in January 1994, Abraham Woldiger and Abraham Taub each took $9,000 from [a housing project maintenance account] and, in January 1995, they each took $7,500 from the same account."

On May 15, 2002, Woldiger filed a petition with this Court for review of the BIA's May 6, 2002 order. On July 11, 2002, before a briefing schedule was set, we granted the INS's motion to dismiss the petition for lack of appellate jurisdiction on the ground that obstructing a federal audit is an aggravated felony under 8 U.S.C. § 1101(a)(43)(M)(I).

On August 1, 2002, Woldiger filed a motion before Judge Korman, asking him to amend the judgment in the criminal case by eliminating the reference to a $1.5 million restitution obligation. The next day, August 2, 2002, Woldiger filed a motion to reopen proceedings before the BIA. Woldiger asked that decision on his motion to reopen be deferred until Judge Korman decided the motion to amend the judgment.

On September 18, 2002, the BIA denied Woldiger's motion to reopen, concluding that his motion pending before Judge Korman did not constitute "new material facts," and stating that "post-conviction motions or other forms of collateral attacks, not constituting direct appeals, do not serve to negate the finality of the convictions or the charge of removability, unless and until the conviction has been overturned . . . ." Woldiger timely filed a petition for review of the BIA's denial with this Court.

Less than a month later, Judge Korman granted Woldiger's motion and entered an amended judgment. The amended judgment disavowed statements in the PSR indicating that Woldiger was liable for $1.8 million, deleted the $1.5 million that had been imposed as restitution, and stated that, at the time of sentencing, the Court "made no findings of actual loss because the offense of conviction did not involve loss."

Having prevailed in his efforts to amend the judgment in his criminal case, Woldiger, on October 21, 2002, filed a second motion to reopen proceedings before the BIA, or, in the alternative, to reconsider its denial of his first motion to reopen. On November 8, 2002, the BIA denied the motion. As for the motion for reconsideration, "the respondent has not demonstrated any error in our decision of September 18, 2002, on the record then before us . . . ." The motion to reopen was denied because "it is an impermissible multiple motion to reopen. *See* 8 C.F.R. § 3.2(c)(2) (2002) . . . ." Finally, the BIA concluded that "respondent has not established that sua sponte reopening or reconsideration is warranted for any reason." Woldiger timely filed with this Court a petition for review. The two petitions have been consolidated for purposes of appeal. Of course, we cannot reach the merits – or lack thereof – of the petitions unless we have jurisdiction. As the following discussion will conclude, we have jurisdiction and the petitions will be denied.

## II. DISCUSSION

A. Jurisdiction

Under 8 U.S.C. § 1252(a)(2)(C), courts of appeals lack jurisdiction to review a final order of removal predicated on an alien's conviction of certain listed criminal offenses, including any "aggravated felony." We have held, however, consistent with other courts of appeals to have considered the issue, that we have jurisdiction to

6

determine whether the jurisdictional bar applies. <u>Patel v. Ashcroft</u>, 294 F.3d 465, 469 (3d Cir. 2002); <u>Drakes v. Zimski</u>, 240 F.3d 246, 247 (3d Cir. 2001). In this case, the jurisdictional question is essentially indistinguishable from the key issue on the merits – whether Woldiger's conviction for obstruction of a federal audit was indeed an aggravated felony, as defined in 8 U.S.C. § 1101(a)(43)(M)(I). <u>See</u> <u>Patel</u>, 294 F.3d at 469 ("The jurisdiction inquiry is, therefore, a back-door merits inquiry . . . .").[1] If it was, we lack jurisdiction.

An aggravated felony is "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeded $10,000." 8 U.S.C. § 1101(a)(43)(M)(I). Because Woldiger concedes that the statute under which he was convicted, 18 U.S.C. § 1516, expressly incorporates fraud or deceit as an element, the question upon which our jurisdiction hinges is whether, in light of the amended judgment, his offense of conviction involved a loss to HUD of more than $10,000. We conclude that it did not.

Woldiger argues that the amended judgment entirely eliminated the basis for the IJ's and BIA's conclusion that his obstruction conviction involved the requisite loss. Indeed, Judge Korman's statement in the amended judgment that "[a]t the time of

---

[1]We reject the government's argument that, under the doctrine of issue or claim preclusion, our May 15, 2002 order dismissing Woldiger's first petition for review for lack of jurisdiction precludes reconsideration of the aggravated felony issue. At the time we issued that order, Judge Korman had not entered the amended judgment deleting Woldiger's $1.5 million restitution obligation. <u>See</u> <u>In re Continental Airlines</u>, 279 F.3d 226, 233 (3d Cir. 2002) (claim preclusion bars reconsideration of the "*very same claim*" decided in prior judgment, while issue preclusion bars "successive litigation of an issue of fact or law *actually litigated and resolved*" in a prior proceeding (emphasis added)).

sentence I made no findings of actual loss because the offense of conviction did not involve loss" strongly suggests that Woldiger's *offense of conviction* did not involve a loss of more than $10,000, even if the other charged offenses which reflected the scheme as a whole did (i.e. conspiracy, equity skimming, and misappropriation of federal funds). The amended judgment also declined to adopt those portions of the PSR which found restitution to be mandatory in Woldiger's case, another way of stating that his offense of conviction did not involve a pecuniary loss to an identifiable victim.

In response, the government argues that, even after the amended judgment, we can conclude that Woldiger's offense of conviction involved a loss of more than $10,000, specifically pointing to the indictment and to the Statement of Reasons in the amended judgment. First, the government contends that Judge Korman, in the amended judgment, continued to adopt the factual findings in the PSR that the total loss to the government from the HUD scheme was $1.8 million, and that in each of seven years Woldiger personally received misdirected HUD monies which totaled well in excess of $10,000. Second, the government contends that the obstruction count expressly incorporated the earlier allegations in the indictment that the Blackstone projects received in excess of $10,000 each year from 1990 through 1997 and that Woldiger received $19,000 dollars from a HUD project account. Finally, in a footnote, the government notes that even if the amended judgment eliminated the original reference to a $1.5 million restitution obligation, it still refers to Woldiger's $900,000 payment in settlement of the civil

forfeiture action as "restitution."

We must determine whether any or all of this may be considered when making the aggravated felony determination. This Court, most other courts of appeals, and the BIA itself have limited the evidence which may be considered in determining whether an alien's conviction is one of the listed removable offenses by applying the "categorical approach" promulgated by the Supreme Court in Taylor v. United States, 495 U.S. 575 (1990). See Francis v. Reno, 269 F.3d 162, 171-72 (3d Cir. 2001) (determining whether misdemeanor conviction for vehicle homicide was aggravated felony); see also, e.g., Chang v. INS, 307 F.3d 1185, 1189 (9th Cir. 2002); Kuhall v. Reno, 266 F.3d 93, 103 (2d Cir. 2001); Emile v. INS, 244 F.3d 183, 187 (1st Cir. 2001); Hernandez-Mancilla v. INS, 246 F.3d 1002, 1005 (7th Cir. 2001); United States v. Zavala-Sustaita, 214 F.3d 601, 603 (5th Cir. 2001); United States v. Reyes-Castro, 13 F.3d 377, 379 (10th Cir. 1993); United States v. Rodriguez, 979 F.2d 138, 140-41 (8th Cir. 1992). While at least one court has noted that "[o]ne could well argue that the Board [is] not obligated to apply Taylor in construing the INA," it nonetheless concluded that the BIA's own citation "without quibble" of Taylor's categorical approach in several cases has established it as the operative analysis for determining whether a prior conviction is a removable offense. Emile, 244 F.3d at 187.

The Supreme Court held in Taylor that in determining whether a defendant's prior conviction constitutes a "violent felony" for the purposes of the sentencing enhancements

of the Armed Career Criminal Act (ACCA), courts must employ a "categorical approach," which "requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense" rather than examining the facts of the crime underlying the conviction. Taylor, 495 U.S. at 602; see also United States v. Jones, 332 F.3d 688, 691-94 (3d Cir. 2003); United States v. Richardson, 313 F.3d 1212, 124-28 (3d. Cir. 2002).  The Court held, however, that "in a narrow range of cases," where the elements of the statute under which the defendant was convicted encompassed non-violent as well as violent felonies, the trial court may consider the charging document or jury instructions, but only to determine whether the jury must have found the elements of a "violent felony" in order to convict the defendant.  Id. at 602.  Along these lines, other courts of appeals have considered charging documents, jury instructions, plea agreements, and plea hearing transcripts to determine if a defendant's prior conviction qualifies as a "violent felony" under the ACCA. See, e.g., United States v. Palmer, 68 F.3d 52, 59 (2d Cir. 1995) (charging instrument and plea hearing transcript); United States v. Cook, 26 F.3d 507, 509-10 (4th Cir. 1994) (charging instrument and jury instructions); United States v. Mathis, 963 F.2d 399, 409-10 (D.C. Cir. 1992) (indictment and jury instructions); United States v. Kaplansky, 42 F.3d 320, 324-25 (6th Cir. 1994) (charging papers,  jury instructions, and plea agreements).

Aside from the dictates of precedent, the reasons stated by the Court in Taylor for mandating the categorical approach (i.e., the ACCA's use of the phrase "previous

convictions" rather than "previous acts," the practical difficulties and potential unfairness of making factual findings on a contested evidentiary record, and potential due process concerns, Taylor, 495 U.S. at 602) also apply to the determination of whether an alien's conviction is an aggravated felony. See Kuhall v. Reno, 266 F.3d 93, 103 (2d Cir. 2001) (applying Taylor's categorical approach because "INA § 237(a)(2)(C) refers to '[a]ny alien who is . . . convicted' of – not any alien who has committed" an aggravated felony, and because "such an approach . . . enjoys the virtues of practicality and evenhanded application, since examining the transcript of the plea colloquy (or the trial) to determine the actual facts of the crime could prove burdensome and produce arbitrary results").

Applying Taylor's categorical approach to Woldiger's conviction for obstructing a federal audit, it is a close question as to whether there is sufficient evidence, in light of the amended judgment, to conclude that his *offense of conviction* resulted in a loss of more than $10,000. We emphasize offense of *conviction* because the indictment, the PSR, and Woldiger's settlement of the civil forfeiture action for $900,000 leave little doubt that the entire scheme perpetrated by Woldiger and his co-defendants caused a loss to HUD well in excess of $10,000. The tricky question is exactly what loss, if any, is attributable to the crime to which Woldiger pled guilty – obstruction of HUD's audit – as opposed to the loss attributable to the three charged offenses that were ultimately dismissed, i.e. the conspiracy, the equity skimming, and the misappropriation counts. In making this determination, we keep in mind Judge Korman's explicit statement in the

11

amended judgment that he made no findings concerning loss, and that loss was not a

factor in determining Woldiger's criminal sentence.[2]

For starters, the government's reliance on the losses charged in the background

section of the indictment is misplaced. While Taylor itself contemplates that a court may

consider a charging instrument, it may only be considered for the purpose of determining

whether the finder of fact *must have found* the facts alleged in the indictment in order to

convict the defendant. Here, while the indictment alleges, for example, that Woldiger

personally received $19,000 from a project account, proof of this was not required before

Judge Korman could accept Woldiger's guilty plea to obstructing a federal audit.[3] This

conclusion distinguishes this case from the case relied upon by the government,

Khalayleh v. INS, 287 F.3d 978, 980 (10th Cir. 2002), in which the Tenth Circuit held

that the defendant's guilty plea to a single count of check fraud not only referred to the

$9,308 check cited in that count of the indictment, but to "a scheme to defraud that

encompassed a number of checks" and, therefore, his conviction constituted an

---

[2] One could argue that the crime of obstructing a federal audit is not one that causes a loss to the victim of a fraud, but is instead the independent act of concealing a loss that results from the fraud. We are not aware of any federal case where there has been a conviction solely on a charge of obstructing an audit in which a defendant was required to pay restitution, or in which the court made a finding of loss (though convictions for obstructing an audit or investigation without a corollary conviction for actual fraud seem to be few and far between).

[3] The government also cites the statement in paragraph four of the indictment that the Blackstone projects received $52 million in federal funds from 1990 through 1997. But there is no allegation that this caused any particular loss, let alone a loss that had to have been found for Woldiger to be convicted on Count Four.

aggravated felony rendering the defendant removable. A guilty plea to obstruction of an audit is not, of course, the equivalent of a guilty plea to the fraud itself. There is no evidence in this record that Woldiger pled guilty to more than a barebones obstruction.

The government's reliance on the factual findings in the PSR arguably presents a more difficult question, but is similarly unavailing under the categorical approach. While the PSR unquestionably recites a number of facts which show that the loss to the government from Woldiger's scheme with his co-defendants was greater than $10,000, and the amended judgment conclusorily "adopts" many of those facts, it is impossible to tell from the PSR what loss, if any, is attributable to the only crime to which Woldiger pled guilty. Moreover, as noted earlier, Judge Korman expressly stated in the amended judgment that the offense did not involve loss, and specifically refused to adopt the PSR's suggestion that restitution was mandatory. In short, none of the loss findings detailed in the PSR were tried in court, admitted by Woldiger, or even the subject of findings by the District Court, rendering any finding of loss insufficiently reliable under the categorical approach. Cf. United States v. Franklin, 235 F.3d 1165, 1172 (9th Cir. 2000) (PSR insufficient under categorical inquiry in ACCA case because did not allow sentencing court to "know[] what a jury actually found or what [the defendant] actually admitted in a plea"); United States v. Brandon, 247 F.3d 186, 194 (4th Cir. 2001) ("[L]ooking to the presentence report to determine the amount of cocaine . . . might well exceed the inquiry authorized by the Supreme Court in Taylor."); United States v. Bull, 182 F.3d 1216, 1223

13

(10th Cir. 1999) ("in determining that the conviction was a violent felony [for sentencing enhancement] the district court . . . erroneously relied on the presentence report").

One Ninth Circuit case held that the BIA may consider the uncontested factual findings in a PSR in determining whether an alien's conviction is an aggravated felony. See Abreu-Reyes, 292 F.3d 1029, 1032 (9th Cir. 2002). Abreu-Reyes, however, failed to even mention Taylor, let alone determine whether consideration of the PSR was permissible under the categorical approach. Abreu-Reyes was also distinguished in a subsequent Ninth Circuit case, Chang v. INS, 307 F.3d 1185, 1192 (9th Cir. 2002). In Chang, the Ninth Circuit held that the BIA could not rely on the PSR's factual findings that the total loss caused by the defendant's bank fraud was greater than $10,000 where such findings were expressly contradicted by the plea agreement's express provision that the loss amount for purposes of the defendant's guilty plea was $605.30. Id. at 1190-92. While Woldiger's plea agreement is not part of the record before us, the PSR's loss findings, if limited to the offense of conviction, could similarly contradict Judge Korman's statement in the amended judgment that that offense "did not involve loss."

Finally, we reject the government's contention that the reference in the amended judgment to Woldiger's agreement to pay $900,000 in settlement of his civil forfeiture case as "restitution" will carry the day. The settlement agreement does not indicate what losses to the government were attributable to the obstruction conviction, what losses were caused by the scheme generally or what part of the $900,000 was attributable to each.

14

In sum, nothing proffered by the government as establishing that Woldiger's offense of conviction involved a $10,000 loss satisfies the limited inquiry allowed by Taylor. That conviction, therefore, is not for an aggravated felony as defined by 8 U.S.C. § 1101(a)(43)(M)(I), and we have jurisdiction over his consolidated petitions for review.

B.     The BIA's Denial of Woldiger's Motions to Reopen and for Reconsideration

The strict statutory and regulatory limitations on motions to reopen before the BIA govern our inquiry. 8 U.S.C. § 1229a(c)(6) provides that an alien may file one motion to reopen deportation proceedings, which, unless it concerns certain asylum applications, must be filed within 90 days of the entry of a final administrative order of removal. The applicable regulation reiterates these limitations. See 8 C.F.R. § 1003.2(c)(2). Motions for reconsideration are similarly subject to strict limitations and "must be filed with the Board within 30 days after the mailing of the Board decision . . . [and a] party may only file one motion to reconsider any given decision." 8 C.F.R. § 1003.2(b)(2). The "Board may at any time reopen or reconsider on its own motion any case in which it had rendered a decision. . . . The decision to grant or deny a motion to reopen or reconsider is within the discretion of the Board . . . [and] [t]he Board has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief." 8 C.F.R. § 1003.2(a). We review the decision of the BIA for abuse of discretion. Sevoian v. Ashcroft, 290 F.3d 166, 170 (3d Cir. 2002).

Under these statutes and regulations, the BIA did not abuse its discretion when it

15

denied Woldiger's first motion to reopen. Woldiger had only moved to amend the judgment in his criminal case a day earlier and, not surprisingly, Judge Korman had not yet acted on it. Moreover, a month before that, we had dismissed the very first petition for review for lack of jurisdiction. To require the BIA to grant a motion to reopen every time a convicted alien makes a post-trial motion or other collateral attack challenging his conviction or sentence would, among other things, encourage frivolous motions designed only to delay an alien's inevitable removal.

Similarly, the BIA did not abuse its discretion in denying Woldiger's second motion to reopen, or, in the alternative, reconsidering the denial of his first motion, and it did not abuse its discretion in applying the procedural bar on successive motions to reopen. First, with reference to the request for reconsideration, the BIA correctly held that its denial of Wolidger's first motion to reopen was proper on the record then before it. The BIA has held, and courts of appeals have recognized, that under the regulatory language, a motion for reconsideration cannot be based on new evidence, such as the amended judgment here, but only upon new arguments concerning the existing record. See Iturribarria v. INS, 321 F.3d 889, 895 (9th Cir. 2003) ("Under the plain language of [the former similar regulation] a motion to reconsider challenges determinations of law and fact made by the BIA . . . using the same record evidence used in making its prior decision."); Matter of Cerna, 20 I.&N. Dec. 399 (BIA 1991) (same).

The BIA's conclusion that Woldiger's second motion to reopen was barred by the

one-motion limitation is equally unassailable.  Both 8 U.S.C. § 1229a(c)(6) and 8 C.F.R. § 1003.2(c)(2) expressly limit aliens to one motion to reopen removal proceedings, which must be filed within 90 days of the BIA's final order.[4]

Finally, presumably in recognition of the fact that he is between the proverbial rock and a hard place, Woldiger argues that the BIA abused its discretion in refusing to reopen the proceedings *sua sponte*, even if his second motion to reopen was barred by the numerical limitation.  We have held, however, that we do not have jurisdiction to review the BIA's discretionary refusal to reopen a case *sua sponte*.  Calle-Vujiles v. Ashcroft, 320 F.3d 472, 474 (3d Cir. 2003).  While we recognized that "there is a strong presumption that Congress intends judicial review of administrative action," we also observed that "review is not available in those rare circumstances where the relevant statute is so drafted that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Id.  Because 8 C.F.R. § 1003.2(a) grants the BIA precisely such unfettered discretion over whether to grant a *sua sponte* reopening, its refusal to exercise this authority is unreviewable. Id. at 475; see also In re J- J-, 21 I.&N. Dec. 976 (BIA 1997) ("the power to reopen on our own motion is not meant to be used as a general cur for filing defects or to otherwise circumvent the regulations, where enforcing them might result in hardship.").

---

[4]The only established exception to the bar seems to be in cases where the first motion was the result of deception or fraud by the alien's counsel or purported counsel, see Varela v. INS, 204 F.3d 1237 (9th Cir. 2000), which is not the case here.

17

The petitions for review will be denied.



      /s/ Maryanne Trump Barry

Circuit Judge